# CAPITOL SQUARE REVIEW AND ADVISORY BOARD ET AL. *v.* PINETTE ET AL.

No. 94–780.   Argued April 26, 1995—Decided June 29, 1995

754

SCALIA, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and III, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, SOUTER, THOMAS, and BREYER, JJ., joined, and an opinion with respect to Part IV, in which REHNQUIST, C. J., and KENNEDY and THOMAS, JJ., joined. THOMAS, J., filed a concurring opinion, *post*, p. 770. O'CONNOR, J., filed an opinion concurring in part and concurring in the judgment, in which SOUTER and BREYER, JJ., joined; *post*, p. 772. SOUTER, J., filed an opinion concurring in part and concurring in the judgment, in which O'CONNOR and BREYER, JJ., joined, *post*, p. 783. STEVENS, J., *post*, p. 797, and GINSBURG, J., *post*, p. 817, filed dissenting opinions.

*Michael J. Renner* argued the cause for petitioners. With him on the briefs were *Betty D. Montgomery*, Attorney General of Ohio, and *Christopher S. Cook, Andrew S. Bergman, Simon B. Karas*, and *Andrew I. Sutter*, Assistant Attorneys General.

*Benson A. Wolman* argued the cause for respondents. With him on the brief were *David Goldberger, Barbara P. O'Toole, Steven R. Shapiro*, and *Peter Joy.*\*

---

*Briefs of *amici curiae* urging reversal were filed for the Town of Trumbell, Connecticut, et al. by *Arthur A. Hiller, Martin B. Margulies*, and *Emanuel Margolis*; for Americans United for Separation of Church and State et al. by *Steven K. Green, Julie A. Segal, Norman Dorsen, Samuel Rabinove, Elliot M. Mincberg, David Saperstein*, and *Richard T. Cassidy*; for the Council on Religious Freedom et al. by *Lee Boothby, Wal-*

JUSTICE SCALIA announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and III, and an opinion with respect to Part IV, in which THE CHIEF JUSTICE, JUSTICE KENNEDY, and JUSTICE THOMAS join.

The Establishment Clause of the First Amendment, made binding upon the States through the Fourteenth Amendment, provides that government "shall make no law respecting an establishment of religion." The question in this case is whether a State violates the Establishment Clause when, pursuant to a religiously neutral state policy, it permits a private party to display an unattended religious symbol in a traditional public forum located next to its seat of government.

I

Capitol Square is a 10-acre, state-owned plaza surrounding the statehouse in Columbus, Ohio. For over a century the square has been used for public speeches, gatherings, and festivals advocating and celebrating a variety of causes, both secular and religious. Ohio Admin. Code Ann. § 128–4–02(A) (1994) makes the square available "for use by the public . . . for free discussion of public questions, or for activities of a broad public purpose," and Ohio Rev. Code Ann. § 105.41 (1994), gives the Capitol Square Review and Advisory Board (Board) responsibility for regulating public access. To use the square, a group must simply fill out an official application

ter E. Carson, Robert W. Nixon, and Rolland Truman; for the Freedom From Religion Foundation, Inc., by Robert R. Tiernan; and for the American Jewish Congress et al. by Marvin E. Frankel, Alan R. Friedman, Richard K. Milin, Marc D. Stern, Lois C. Waldman, and Steve Freeman.

Briefs of amici curiae urging affirmance were filed for the American Center for Law & Justice by Jay Alan Sekulow, James M. Henderson, Sr., and Keith A. Fournier; for the Chabad House of Western Michigan, Inc., et al. by Nathan Lewin; for the Christian Legal Society by Thomas C. Berg, Steven T. McFarland, Samuel B. Casey, Gregory S. Baylor, and Kimberlee Wood Colby; for the Knights of Columbus Council 2961 et al. by Kevin J. Hasson; and for Liberty Counsel by Mathew D. Staver.

form and meet several criteria, which concern primarily safety, sanitation, and noninterference with other uses of the square, and which are neutral as to the speech content of the proposed event. App. 107–110; Ohio Admin. Code Ann. § 128–4–02 (1994).

It has been the Board's policy "to allow a broad range of speakers and other gatherings of people to conduct events on the Capitol Square." Brief for Petitioners 3–4. Such diverse groups as homosexual rights organizations, the Ku Klux Klan, and the United Way have held rallies. The Board has also permitted a variety of unattended displays on Capitol Square: a state-sponsored lighted tree during the Christmas season, a privately sponsored menorah during Chanukah, a display showing the progress of a United Way fundraising campaign, and booths and exhibits during an arts festival. Although there was some dispute in this litigation regarding the frequency of unattended displays, the District Court found, with ample justification, that there was no policy against them. 844 F. Supp. 1182, 1184 (SD Ohio 1993).

In November 1993, after reversing an initial decision to ban unattended holiday displays from the square during December 1993, the Board authorized the State to put up its annual Christmas tree. On November 29, 1993, the Board granted a rabbi's application to erect a menorah. That same day, the Board received an application from respondent Donnie Carr, an officer of the Ohio Ku Klux Klan, to place a cross on the square from December 8, 1993, to December 24, 1993. The Board denied that application on December 3, informing the Klan by letter that the decision to deny "was made upon the advice of counsel, in a good faith attempt to comply with the Ohio and United States Constitutions, as they have been interpreted in relevant decisions by the Federal and State Courts." App. 47.

Two weeks later, having been unsuccessful in its effort to obtain administrative relief from the Board's decision, the Ohio Klan, through its leader Vincent Pinette, filed the pres-

ent suit in the United States District Court for the Southern District of Ohio, seeking an injunction requiring the Board to issue the requested permit. The Board defended on the ground that the permit would violate the Establishment Clause. The District Court determined that Capitol Square was a traditional public forum open to all without any policy against freestanding displays; that the Klan's cross was entirely private expression entitled to full First Amendment protection; and that the Board had failed to show that the display of the cross could reasonably be construed as endorsement of Christianity by the State. The District Court issued the injunction and, after the Board's application for an emergency stay was denied, 510 U. S. 1307 (1993) (STEVENS, J., in chambers), the Board permitted the Klan to erect its cross. The Board then received, and granted, several additional applications to erect crosses on Capitol Square during December 1993 and January 1994.

On appeal by the Board, the United States Court of Appeals for the Sixth Circuit affirmed the District Court's judgment. 30 F. 3d 675 (1994). That decision agrees with a ruling by the Eleventh Circuit, *Chabad-Lubavitch* v. *Miller*, 5 F. 3d 1383 (1993), but disagrees with decisions of the Second and Fourth Circuits, *Chabad-Lubavitch* v. *Burlington*, 936 F. 2d 109 (CA2 1991), cert. denied, 505 U. S. 1218 (1992), *Kaplan* v. *Burlington*, 891 F. 2d 1024 (CA2 1989), cert. denied, 496 U. S. 926 (1990), *Smith* v. *County of Albemarle*, 895 F. 2d 953 (CA4), cert. denied, 498 U. S. 823 (1990). We granted certiorari. 513 U. S. 1106 (1995).

## II

First, a preliminary matter: Respondents contend that we should treat this as a case in which freedom of speech (the Klan's right to present the message of the cross display) was denied because of the State's disagreement with that message's political content, rather than because of the State's desire to distance itself from sectarian religion. They sug-

gest in their merits brief and in their oral argument that Ohio's genuine reason for disallowing the display was disapproval of the political views of the Ku Klux Klan. Whatever the fact may be, the case was not presented and decided that way. The record facts before us and the opinions below address only the Establishment Clause issue;[1] that is the question upon which we granted certiorari; and that is the sole question before us to decide.

Respondents' religious display in Capitol Square was private expression. Our precedent establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression. *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384 (1993); *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens*, 496 U. S. 226 (1990); *Widmar* v. *Vincent*, 454 U. S. 263 (1981); *Heffron* v. *International Soc. for Krishna Consciousness, Inc.*, 452 U. S. 640 (1981). Indeed, in Anglo-American history, at least, government suppression of speech has so commonly been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince. Accordingly, we have not excluded from free-speech protections religious proselytizing, *Heffron, supra,* at 647, or even acts of worship, *Widmar, supra,* at 269, n. 6. Petitioners do not dispute that respondents, in displaying their cross, were engaging in constitutionally protected expression. They do contend that the constitutional pro-

---

[1] Respondents claim that the Sixth Circuit's statement that "[z]ealots have First Amendment rights too," even if their views are unpopular, shows that the case is actually about discrimination against political speech. That conclusion is possible only if the statement is ripped from its context, which was this: "The potency of religious speech is not a constitutional infirmity; the most fervently devotional and blatantly sectarian speech is protected when it is private speech in a public forum. Zealots have First Amendment rights too." 30 F. 3d 675, 680 (1994). The court was obviously addressing zealous (and unpopular) *religious* speech.

tection does not extend to the length of permitting that expression to be made on Capitol Square.

It is undeniable, of course, that speech which is constitutionally protected against state suppression is not thereby accorded a guaranteed forum on all property owned by the State. *Postal Service* v. *Council of Greenburgh Civic Assns.*, 453 U. S. 114, 129 (1981); *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 44 (1983). The right to use government property for one's private expression depends upon whether the property has by law or tradition been given the status of a public forum, or rather has been reserved for specific official uses. *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788, 802–803 (1985). If the former, a State's right to limit protected expressive activity is sharply circumscribed: It may impose reasonable, content-neutral time, place, and manner restrictions (a ban on all unattended displays, which did not exist here, might be one such), but it may regulate expressive *content* only if such a restriction is necessary, and narrowly drawn, to serve a compelling state interest. *Perry Ed. Assn., supra,* at 45. These strict standards apply here, since the District Court and the Court of Appeals found that Capitol Square was a traditional public forum. 844 F. Supp., at 1184; 30 F. 3d, at 678.

Petitioners do not claim that their denial of respondents' application was based upon a content-neutral time, place, or manner restriction. To the contrary, they concede—indeed it is the essence of their case—that the Board rejected the display precisely because its content was religious. Petitioners advance a single justification for closing Capitol Square to respondents' cross: the State's interest in avoiding official endorsement of Christianity, as required by the Establishment Clause.

## III

There is no doubt that compliance with the Establishment Clause is a state interest sufficiently compelling to justify

content-based restrictions on speech. See *Lamb's Chapel, supra,* at 394–395; *Widmar, supra,* at 271. Whether that interest is implicated here, however, is a different question. And we do not write on a blank slate in answering it. We have twice previously addressed the combination of private religious expression, a forum available for public use, content-based regulation, and a State's interest in complying with the Establishment Clause. Both times, we have struck down the restriction on religious content. *Lamb's Chapel, supra; Widmar, supra.*

In *Lamb's Chapel,* a school district allowed private groups to use school facilities during off-hours for a variety of civic, social, and recreational purposes, excluding, however, religious purposes. We held that even if school property during off-hours was not a public forum, the school district violated an. applicant's free-speech rights by denying it use of the facilities solely because of the religious viewpoint of the program it wished to present. 508 U. S., at 390–395. We rejected the district's compelling-state-interest Establishment Clause defense (the same made here) because the school property was open to a wide variety of uses, the district was not directly sponsoring the religious group's activity, and "any benefit to religion or to the Church would have been no more than incidental." *Id.,* at 395. The *Lamb's Chapel* reasoning applies *a fortiori* here, where the property at issue is not a school but a full-fledged public forum.

*Lamb's Chapel* followed naturally from our decision in *Widmar,* in which we examined a public university's exclusion of student religious groups from facilities available to other student groups. There also we addressed official discrimination against groups who wished to use a "generally open forum" for religious speech. 454 U. S., at 269. And there also the State claimed that its compelling interest in complying with the Establishment Clause justified the content-based restriction. We rejected the defense because

the forum created by the State was open to a broad spectrum of groups and would provide only incidental benefit to religion. *Id.*, at 274. We stated categorically that "an open forum in a public university does not confer any imprimatur of state approval on religious sects or practices." *Ibid.*

Quite obviously, the factors that we considered determinative in *Lamb's Chapel* and *Widmar* exist here as well. The State did not sponsor respondents' expression, the expression was made on government property that had been opened to the public for speech, and permission was requested through the same application process and on the same terms required of other private groups.

## IV

Petitioners argue that one feature of the present case distinguishes it from *Lamb's Chapel* and *Widmar:* the forum's proximity to the seat of government, which, they contend, may produce the perception that the cross bears the State's approval. They urge us to apply the so-called "endorsement test," see, *e. g., County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S. 573 (1989); *Lynch* v. *Donnelly,* 465 U. S. 668 (1984), and to find that, because an observer might mistake private expression for officially endorsed religious expression, the State's content-based restriction is constitutional.

We must note, to begin with, that it is not really an "endorsement test" of any sort, much less the "endorsement test" which appears in our more recent Establishment Clause jurisprudence, that petitioners urge upon us. "Endorsement" connotes an expression or demonstration of approval or support. The New Shorter Oxford English Dictionary 818 (1993); Webster's New Dictionary 845 (2d ed. 1950). Our cases have accordingly equated "endorsement" with "promotion" or "favoritism." *Allegheny, supra,* at 593 (citing cases). We find it peculiar to say that government

"promotes" or "favors" a religious display by giving it the same access to a public forum that all other displays enjoy. And as a matter of Establishment Clause jurisprudence, we have consistently held that it is no violation for government to enact neutral policies that happen to benefit religion. See, *e. g., Bowen* v. *Kendrick,* 487 U. S. 589, 608 (1988); *Witters* v. *Washington Dept. of Servs. for Blind,* 474 U. S. 481, 486–489 (1986); *Mueller* v. *Allen,* 463 U. S. 388 (1983); *McGowan* v. *Maryland,* 366 U. S. 420 (1961). Where we have tested for endorsement of religion, the subject of the test was either expression *by the government itself, Lynch, supra,* or else government action alleged to *discriminate in favor* of private religious expression or activity, *Board of Ed. of Kiryas Joel Village School Dist.* v. *Grumet,* 512 U. S. 687, 708–710 (1994); *Allegheny, supra.* The test petitioners propose, which would attribute to a neutrally behaving government *private* religious expression, has no antecedent in our jurisprudence, and would better be called a "transferred endorsement" test.

Petitioners rely heavily on *Allegheny* and *Lynch,* but each is easily distinguished. In *Allegheny* we held that the display of a privately sponsored crèche on the "Grand Staircase" of the Allegheny County Courthouse violated the Establishment Clause. That staircase was not, however, open to all on an equal basis, so the county was *favoring* sectarian religious expression. 492 U. S., at 599–600, and n. 50 ("The Grand Staircase does not appear to be the kind of location in which all were free to place their displays"). We expressly distinguished that site from the kind of public forum at issue here, and made clear that if the staircase were available to all on the same terms, "the presence of the crèche in that location for over six weeks would then *not* serve to associate the government with the crèche." *Ibid.* (emphasis added). In *Lynch* we held that a city's display of a crèche did not violate the Establishment Clause because, in context, the

display did not endorse religion. 465 U. S., at 685–687. The opinion does assume, as petitioners contend, that the *government's* use of religious symbols is unconstitutional if it effectively endorses sectarian religious belief. But the case neither holds nor even remotely assumes that the government's neutral treatment of *private* religious expression can be unconstitutional.

Petitioners argue that absence of perceived endorsement was material in *Lamb's Chapel* and *Widmar.* We did state in *Lamb's Chapel* that there was "no realistic danger that the community would think that the District was endorsing religion or any particular creed," 508 U. S., at 395. But that conclusion was not the result of empirical investigation; it followed directly, we thought, from the fact that the forum was open and the religious activity privately sponsored. See *ibid.* It is significant that we referred only to what would be thought by "the community"—not by outsiders or individual members of the community uninformed about the school's practice. Surely some of the latter, hearing of religious ceremonies on school premises, and not knowing of the premises' availability and use for all sorts of other private activities, *might* leap to the erroneous conclusion of state endorsement. But, we in effect said, given an open forum and private sponsorship, erroneous conclusions do not count. So also in *Widmar.* Once we determined that the benefit to religious groups from the public forum was incidental and shared by other groups, we categorically rejected the State's Establishment Clause defense. 454 U. S., at 274.

What distinguishes *Allegheny* and the dictum in *Lynch* from *Widmar* and *Lamb's Chapel* is the difference between government speech and private speech. "[T]here is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Mergens,* 496 U. S., at 250 (opin-

ion of O'CONNOR, J.).[2] Petitioners assert, in effect, that that distinction disappears when the private speech is conducted too close to the symbols of government. But that, of course, must be merely a subpart of a more general principle: that the distinction disappears whenever private speech can be mistaken for government speech. That proposition cannot be accepted, at least where, as here, the government has not fostered or encouraged the mistake.

Of course, giving sectarian religious speech preferential access to a forum close to the seat of government (or anywhere else for that matter) would violate the Establishment Clause (as well as the Free Speech Clause, since it would involve content discrimination). And one can conceive of a case in which a governmental entity manipulates its administration of a public forum close to the seat of government (or within a government building) in such a manner that only certain religious groups take advantage of it, creating an impression of endorsement *that is in fact accurate.* But those situations, which involve governmental *favoritism,* do not exist here. Capitol Square is a genuinely public forum, is known to be a public forum, and has been widely used as a public forum for many, many years. Private religious speech cannot be subject to veto by those who see favoritism where there is none.

The contrary view, most strongly espoused by JUSTICE STEVENS, *post,* at 806–807, but endorsed by JUSTICE SOUTER and JUSTICE O'CONNOR as well, exiles private religious speech to a realm of less-protected expression heretofore

---

[2] This statement in JUSTICE O'CONNOR's *Mergens* opinion is followed by the observation: "We think that secondary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis." 496 U. S., at 250. JUSTICE O'CONNOR today says this observation means that, even when we recognize private speech to be at issue, we must apply the endorsement test. *Post,* at 774–775. But that would cause the second sentence to contradict the first, saying in effect that the "difference between *government* speech . . . and *private* speech" is *not* "crucial."

inhabited only by sexually explicit displays and commercial speech. *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50, 61, 70–71 (1976); *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557 (1980). It will be a sad day when this Court casts piety in with pornography, and finds the First Amendment more hospitable to private expletives, see *Cohen* v. *California*, 403 U. S. 15, 26 (1971), than to private prayers. This would be merely bizarre were religious speech simply *as* protected by the Constitution as other forms of private speech; but it is outright perverse when one considers that private religious expression receives *preferential* treatment under the Free Exercise Clause. It is no answer to say that the Establishment Clause tempers religious speech. By its terms that Clause applies only to the words and acts of *government*. It was never meant, and has never been read by this Court, to serve as an impediment to purely *private* religious speech connected to the State only through its occurrence in a public forum.

Since petitioners' "transferred endorsement" principle cannot possibly be restricted to squares in front of state capitols, the Establishment Clause regime that it would usher in is most unappealing. To require (and permit) access by a religious group in *Lamb's Chapel*, it was sufficient that the group's activity was not in fact government sponsored, that the event was open to the public, and that the benefit of the facilities was shared by various organizations. Petitioners' rule would require school districts adopting similar policies in the future to guess whether some undetermined critical mass of the community might nonetheless perceive the district to be advocating a religious viewpoint. Similarly, state universities would be forced to reassess our statement that "an open forum in a public university does not confer any imprimatur of state approval on religious sects or practices." *Widmar*, 454 U. S., at 274. Whether it does would henceforth depend upon immediate appearances. Policymakers

would find themselves in a vise between the Establishment Clause on one side and the Free Speech and Free Exercise Clauses on the other. Every proposed act of private, religious expression in a public forum would force officials to weigh a host of imponderables. How close to government is too close? What kind of building, and in what context, symbolizes state authority? If the State guessed wrong in one direction, it would be guilty of an Establishment Clause violation; if in the other, it would be liable for suppressing free exercise or free speech (a risk not run when the State restrains only its *own* expression).

The "transferred endorsement" test would also disrupt the settled principle that policies providing incidental benefits to religion do not contravene the Establishment Clause. That principle is the basis for the constitutionality of a broad range of laws, not merely those that implicate free-speech issues, see, *e. g., Witters* v. *Washington Dept. of Servs. for Blind,* 474 U. S. 481 (1986); *Mueller* v. *Allen,* 463 U. S. 388 (1983). It has radical implications for our public policy to suggest that neutral laws are invalid whenever hypothetical observers may—*even reasonably*—confuse an incidental benefit to religion with state endorsement.[3]

---

[3] If it is true, as JUSTICE O'CONNOR suggests, *post,* at 775, that she would not "be likely to come to a different result from the plurality where truly private speech is allowed on equal terms in a vigorous public forum that the government has administered properly," then she is extending the "endorsement test" to private speech to cover an eventuality that is "not likely" to occur. Before doing that, it would seem desirable to explore the precise degree of the unlikelihood (is it perhaps 100%?)—for as we point out in text, the extension to private speech has considerable costs. Contrary to what JUSTICE O'CONNOR, JUSTICE SOUTER, and JUSTICE STEVENS argue, the endorsement test does not supply an appropriate standard for the inquiry before us. It supplies no standard whatsoever. The lower federal courts that JUSTICE O'CONNOR's concurrence identifies as having "applied the endorsement test in precisely the context before us today," *ibid.,* have reached precisely *differing* results—which is what led the Court to take this case. And if further proof of the invited chaos

If Ohio is concerned about misperceptions, nothing prevents it from requiring all private displays in the square to be identified as such. That would be a content-neutral "manner" restriction that is assuredly constitutional. See *Clark* v. *Community for Creative Non-Violence,* 468 U. S. 288, 293 (1984). But the State may not, on the claim of misperception of official endorsement, ban all private religious speech from the public square, or discriminate against it by requiring religious speech alone to disclaim public sponsorship.[4]

---

is required, one need only follow the debate between the concurrence and JUSTICE STEVENS' dissent as to whether the hypothetical beholder who will be the determinant of "endorsement" should be *any* beholder (no matter how unknowledgeable), or the *average* beholder, or (what JUSTICE STEVENS accuses the concurrence of favoring) the "ultrareasonable" beholder. See *post,* at 778–782 (O'CONNOR, J., concurring in part and concurring in judgment); *post,* at 807–808 (STEVENS, J., dissenting). And, of course, even when one achieves agreement upon that question, it will be unrealistic to expect different judges (or should it be juries?) to reach consistent answers as to what any beholder, the average beholder, or the ultrareasonable beholder (as the case may be) would think. It is irresponsible to make the Nation's legislators walk this minefield.

[4] For this reason, among others, we do not inquire into the adequacy of the identification that was attached to the cross ultimately erected in this case. The difficulties posed by such an inquiry, however, are yet another reason to reject the principle of "transferred endorsement." The only principled line for adequacy of identification would be identification that is legible at whatever distance the cross is visible. Otherwise, the uninformed viewer who does not have time or inclination to come closer to read the sign might be misled, just as (under current law) the uninformed viewer who does not have time or inclination to inquire whether speech in Capitol Square is publicly endorsed speech might be misled. Needless to say, such a rule would place considerable constraint upon religious speech, not to mention that it would be ridiculous. But if one rejects that criterion, courts would have to decide (on what basis we cannot imagine) how large an identifying sign is large enough. Our Religion Clause jurisprudence is complex enough without the addition of this highly litigable feature.

* * *

Religious expression cannot violate the Establishment Clause where it (1) is purely private and (2) occurs in a traditional or designated public forum, publicly announced and open to all on equal terms. Those conditions are satisfied here, and therefore the State may not bar respondents' cross from Capitol Square.

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE THOMAS, concurring.

I join the Court's conclusion that petitioners' exclusion of the Ku Klux Klan's cross cannot be justified on Establishment Clause grounds. But the fact that the legal issue before us involves the Establishment Clause should not lead anyone to think that a cross erected by the Ku Klux Klan is a purely religious symbol. The erection of such a cross is a political act, not a Christian one.

There is little doubt that the Klan's main objective is to establish a racist white government in the United States. In Klan ceremony, the cross is a symbol of white supremacy and a tool for the intimidation and harassment of racial minorities, Catholics, Jews, Communists, and any other groups hated by the Klan. The cross is associated with the Klan not because of religious worship, but because of the Klan's practice of cross burning. Cross burning was entirely unknown to the early Ku Klux Klan, which emerged in some Southern States during Reconstruction. W. Wade, The Fiery Cross: The Ku Klux Klan in America 146 (1987). The practice appears to have been the product of Thomas Dixon, whose book The Clansman formed the story for the movie, The Birth of a Nation. See M. Newton & J. Newton, The Ku Klux Klan: An Encyclopedia 145–146 (1991). In the book, cross burning is borrowed from an "old Scottish rite" (Dixon apparently believed that the members of the Reconstruction Ku Klux Klan were the "reincarnated souls of the

Clansmen of Old Scotland") that the Klan uses to celebrate the execution of a former slave. T. Dixon, The Clansman: An Historical Romance of the Ku Klux Klan 324–326 (1905). Although the cross took on some religious significance in the 1920's when the Klan became connected with certain southern white clergy, by the postwar period it had reverted to its original function as an instrument of intimidation. Wade, *supra*, at 185, 279.

To be sure, the cross appears to serve as a religious symbol of Christianity for some Klan members. The hymn "The Old Rugged Cross" is sometimes played during cross burnings. See W. Moore, A Sheet and a Cross: A Symbolic Analysis of the Ku Klux Klan 287–288 (Ph.D. dissertation, Tulane University, 1975). But to the extent that the Klan had a message to communicate in Capitol Square, it was primarily a political one. During his testimony before the District Court, the leader of the local Klan testified that the cross was seen "as a symbol of freedom, as a symbol of trying to unite our people." App. 150. The Klan chapter wished to erect the cross because it was also "a symbol of freedom from tyranny," and because it "was also incorporated in the confederate battle flag." *Ibid.* Of course, the cross also had some religious connotation; the Klan leader linked the cross to what he claimed was one of the central purposes of the Klan: "to establish a Christian government in America." *Id.*, at 142–145. But surely this message was both political and religious in nature.

Although the Klan might have sought to convey a message with some religious component, I think that the Klan had a primarily nonreligious purpose in erecting the cross. The Klan simply has appropriated one of the most sacred of religious symbols as a symbol of hate. In my mind, this suggests that this case may not have truly involved the Establishment Clause, although I agree with the Court's disposition because of the manner in which the case has come

before us. In the end, there may be much less here than meets the eye.

JUSTICE O'CONNOR, with whom JUSTICE SOUTER and JUSTICE BREYER join, concurring in part and concurring in the judgment.

I join Parts I, II, and III of the Court's opinion and concur in the judgment. Despite the messages of bigotry and racism that may be conveyed along with religious connotations by the display of a Ku Klux Klan cross, see *ante*, at 771 (THOMAS, J., concurring), at bottom this case must be understood as it has been presented to us—as a case about private religious expression and whether the State's relationship to it violates the Establishment Clause. In my view, "the endorsement test asks the right question about governmental practices challenged on Establishment Clause grounds, including challenged practices involving the display of religious symbols," *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 628 (1989) (O'CONNOR, J., concurring in part and concurring in judgment), even where a neutral state policy toward private religious speech in a public forum is at issue. Accordingly, I see no necessity to carve out, as the plurality opinion would today, an exception to the endorsement test for the public forum context.

For the reasons given by JUSTICE SOUTER, whose opinion I also join, I conclude on the facts of this case that there is "no realistic danger that the community would think that the [State] was endorsing religion or any particular creed," *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384, 395 (1993), by granting respondents a permit to erect their temporary cross on Capitol Square. I write separately, however, to emphasize that, because it seeks to identify those situations in which government makes "'adherence to a religion relevant . . . to a person's standing in the political community,'" *Allegheny, supra*, at 594 (quoting

*Lynch* v. *Donnelly*, 465 U. S. 668, 687 (1984) (O'CONNOR, J., concurring), the endorsement test necessarily focuses upon the perception of a reasonable, informed observer.

I

"In recent years, we have paid particularly close attention [in Establishment Clause cases] to whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion, a concern that has long had a place in our Establishment Clause jurisprudence." *Allegheny, supra,* at 592. See also *Lamb's Chapel, supra,* at 395; *School Dist. of Grand Rapids* v. *Ball,* 473 U. S. 373, 390 (1985) (asking "whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices"). A government statement "'that religion or a particular religious belief is favored or preferred,'" *Allegheny, supra,* at 593 (quoting *Wallace* v. *Jaffree,* 472 U. S. 38, 70 (1985) (O'CONNOR, J., concurring in judgment), violates the prohibition against establishment of religion because such "[e]ndorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community," *Lynch, supra,* at 688 (O'CONNOR, J., concurring). See also *Allegheny, supra,* at 628 (O'CONNOR, J., concurring in part and concurring in judgment); *Wallace, supra,* at 69 (O'CONNOR, J., concurring in judgment). Although "[e]xperience proves that the Establishment Clause . . . cannot easily be reduced to a single test," *Board of Ed. of Kiryas Joel Village School Dist.* v. *Grumet,* 512 U. S. 687, 720 (1994) (O'CONNOR, J., concurring in part and concurring in judgment), the endorsement inquiry captures the fundamental requirement of the Establishment Clause when courts are called upon to evalu-

ate the constitutionality of religious symbols on public property. See *Allegheny, supra,* at 593–594.

While the plurality would limit application of the endorsement test to "expression *by the government itself,* . . . or else government action alleged to *discriminate in favor* of private religious expression or activity," *ante,* at 764, I believe that an impermissible message of endorsement can be sent in a variety of contexts, not all of which involve direct government speech or outright favoritism. See *infra,* at 777–778. It is true that neither *Allegheny* nor *Lynch,* our two prior religious display cases, involved the same combination of private religious speech and a public forum that we have before us today. Nonetheless, as JUSTICE SOUTER aptly demonstrates, *post,* at 786–792, we have on several occasions employed an endorsement perspective in Establishment Clause cases where private religious conduct has intersected with a neutral governmental policy providing some benefit in a manner that parallels the instant case. Thus, while I join the discussion of *Lamb's Chapel* and *Widmar* v. *Vincent,* 454 U. S. 263 (1981), in Part III of the Court's opinion, I do so with full recognition that the factors the Court properly identifies ultimately led in each case to the conclusion that there was no endorsement of religion by the State. *Lamb's Chapel, supra,* at 395; *Widmar, supra,* at 274. See also *post,* at 790–791 (SOUTER, J., concurring in part and concurring in judgment).

There is, as the plurality notes, *ante,* at 765, "a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens,* 496 U. S. 226, 250 (1990) (plurality opinion). But the quoted statement was made while applying the endorsement test itself; indeed, the sentence upon which the plurality relies was followed immediately by the conclusion that "secondary school students are mature enough and are likely to understand that a school does not

endorse or support student speech that it merely permits on a nondiscriminatory basis." *Ibid.* Thus, as I read the decisions JUSTICE SOUTER carefully surveys, our prior cases do not imply that the endorsement test has no place where private religious speech in a public forum is at issue. Moreover, numerous lower courts (including the Court of Appeals in this case) have applied the endorsement test in precisely the context before us today. See, *e. g., Chabad-Lubavitch of Georgia* v. *Miller,* 5 F. 3d 1383 (CA11 1993) (en banc); *Kreisner* v. *San Diego,* 1 F. 3d 775, 782–787 (CA9 1993), cert. denied, 510 U. S. 1044 (1994); *Americans United for Separation of Church and State* v. *Grand Rapids,* 980 F. 2d 1538 (CA6 1992) (en banc); *Doe* v. *Small,* 964 F. 2d 611 (CA7 1992) (en banc); cf. *Smith* v. *County of Albemarle,* 895 F. 2d 953 (CA4), cert. denied, 498 U. S. 823 (1990); *Kaplan* v. *Burlington,* 891 F. 2d 1024 (CA2 1989), cert. denied, 496 U. S. 926 (1990). Given this background, I see no necessity to draw new lines where "[r]eligious expression . . . (1) is purely private and (2) occurs in a traditional or designated public forum," *ante,* at 770.

None of this is to suggest that I would be likely to come to a different result from the plurality where truly private speech is allowed on equal terms in a vigorous public forum that the government has administered properly. That the religious display at issue here was erected by a private group in a public square available "for use by the public . . . for free discussion of public questions, or for activities of a broad public purpose," Ohio Admin. Code Ann. § 128–4–02(A) (1994), certainly informs the Establishment Clause inquiry under the endorsement test. Indeed, many of the factors the plurality identifies are some of those I would consider important in deciding cases like this one where religious speakers seek access to public spaces: "The State did not sponsor respondents' expression, the expression was made on government property that had been opened to the public for speech, and permission was requested through the

same application process and on the same terms required of other private groups." *Ante,* at 763. And, as I read the plurality opinion, a case is not governed by its proposed *per se* rule where such circumstances are otherwise—that is, where preferential placement of a religious symbol in a public space or government manipulation of the forum is involved. · See *ante,* at 766.

To the plurality's consideration of the open nature of the forum and the private ownership of the display, however, I would add the presence of a sign disclaiming government sponsorship or endorsement on the Klan cross, which would make the State's role clear to the community. This factor is important because, as JUSTICE SOUTER makes clear, *post,* at 785–786, certain aspects of the cross display in this case arguably intimate government approval of respondents' private religious message—particularly that the cross is an especially potent sectarian symbol which stood unattended in close proximity to official government buildings. In context, a disclaimer helps remove doubt about state approval of respondents' religious message. Cf. *Widmar, supra,* at 274, n. 14 ("In light of the large number of groups meeting on campus, however, we doubt students could draw any reasonable inference of University support from the mere fact of a campus meeting place. The University's student handbook already notes that the University's name will not 'be identified in any way with the aims, policies, programs, products, or opinions of any organization or its members' "). On these facts, then, "the message [of inclusion] is one of neutrality rather than endorsement." *Mergens, supra,* at 248 (plurality opinion).

Our agreement as to the outcome of this case, however, cannot mask the fact that I part company with the plurality on a fundamental point: I disagree that "[i]t has radical implications for our public policy to suggest that neutral laws are invalid whenever hypothetical observers may—*even reasonably*—confuse an incidental benefit to religion with state

endorsement." *Ante,* at 768. On the contrary, when the reasonable observer would view a government practice as endorsing religion, I believe that it is our *duty* to hold the practice invalid. The plurality today takes an exceedingly narrow view of the Establishment Clause that is out of step both with the Court's prior cases and with well-established notions of what the Constitution requires. The Clause is more than a negative prohibition against certain narrowly defined forms of government favoritism, see *ante,* at 766; it also imposes affirmative obligations that may require a State, in some situations, to take steps to avoid being perceived as supporting or endorsing a private religious message. That is, the Establishment Clause forbids a State to hide behind the application of formally neutral criteria and remain studiously oblivious to the effects of its actions. Governmental intent cannot control, and not all state policies are permissible under the Religion Clauses simply because they are neutral in form.

Where the government's operation of a public forum has the effect of endorsing religion, even if the governmental actor neither intends nor actively encourages that result, see *Lynch,* 465 U. S., at 690 (O'CONNOR, J., concurring), the Establishment Clause is violated. This is so not because of "'transferred endorsement,'" *ante,* at 764, or mistaken attribution of private speech to the State, but because the State's own actions (operating the forum in a particular manner and permitting the religious expression to take place therein), and their relationship to the private speech at issue, *actually convey* a message of endorsement. At some point, for example, a private religious group may so dominate a public forum that a formal policy of equal access is transformed into a demonstration of approval. Cf. *Mergens,* 454 U. S., at 275 (concluding that there was no danger of an Establishment Clause violation in a public university's allowing access by student religious groups to facilities available to others "[a]t least in the absence of empirical evidence that religious

groups will dominate [the school's] open forum"). Other circumstances may produce the same effect—whether because of the fortuity of geography, the nature of the particular public space, or the character of the religious speech at issue, among others. Our Establishment Clause jurisprudence should remain flexible enough to handle such situations when they arise.

In the end, I would recognize that the Establishment Clause inquiry cannot be distilled into a fixed, *per se* rule. Thus, "[e]very government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion." *Lynch,* 465 U. S., at 694 (O'CONNOR, J., concurring). And this question cannot be answered in the abstract, but instead requires courts to examine the history and administration of a particular practice to determine whether it operates as such an endorsement. I continue to believe that government practices relating to speech on religious topics "must be subjected to careful judicial scrutiny," *ibid.,* and that the endorsement test supplies an appropriate standard for that inquiry.

## II

Conducting the review of government action required by the Establishment Clause is always a sensitive matter. Unfortunately, as I noted in *Allegheny,* "even the development of articulable standards and guidelines has not always resulted in agreement among the Members of this Court on the results in individual cases." 492 U. S., at 623. Today, JUSTICE STEVENS reaches a different conclusion regarding whether the Board's decision to allow respondents' display on Capitol Square constituted an impermissible endorsement of the cross' religious message. Yet I believe it is important to note that we have not simply arrived at divergent results after conducting the same analysis. Our fundamental point of departure, it appears, concerns the knowledge that is properly attributed to the test's "reasonable observer [who]

evaluates whether a challenged governmental practice conveys a message of endorsement of religion." *Id.,* at 630 (O'CONNOR, J., concurring in part and concurring in judgment). In my view, proper application of the endorsement test requires that the reasonable observer be deemed more informed than the casual passerby postulated by JUSTICE STEVENS.

Because an Establishment Clause violation must be moored in government action of some sort, and because our concern is with the political community writ large, see *Allegheny, supra,* at 627 (O'CONNOR, J., concurring in part and concurring in judgment); *Lynch, supra,* at 690, the endorsement inquiry is not about the perceptions of particular individuals or saving isolated nonadherents from the discomfort of viewing symbols of a faith to which they do not subscribe. Indeed, to avoid "entirely sweep[ing] away all government recognition and acknowledgment of the role of religion in the lives of our citizens," *Allegheny, supra,* at 623 (O'CONNOR, J., concurring in part and concurring in judgment), our Establishment Clause jurisprudence must seek to identify the point at which the government becomes responsible, whether due to favoritism toward or disregard for the evident effect of religious speech, for the injection of religion into the political life of the citizenry.

I therefore disagree that the endorsement test should focus on the actual perception of individual observers, who naturally have differing degrees of knowledge. Under such an approach, a religious display is necessarily precluded so long as some passersby would perceive a governmental endorsement thereof. In my view, however, the endorsement test creates a more collective standard to gauge "the 'objective' meaning of the [government's] statement in the community," *Lynch, supra,* at 690 (O'CONNOR, J., concurring). In this respect, the applicable observer is similar to the "reasonable person" in tort law, who "is not to be identified with any ordinary individual, who might occasionally do unreasonable

things," but is "rather a personification of a community ideal of reasonable behavior, determined by the [collective] social judgment." W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 175 (5th ed. 1984). Thus, "we do not ask whether there is *any* person who could find an endorsement of religion, whether *some* people may be offended by the display, or whether *some* reasonable person *might* think [the State] endorses religion." *Americans United*, 980 F. 2d, at 1544. Saying that the endorsement inquiry should be conducted from the perspective of a hypothetical observer who is presumed to possess a certain level of information that all citizens might not share neither chooses the perceptions of the majority over those of a "reasonable non-adherent," cf. L. Tribe, American Constitutional Law 1293 (2d ed. 1988), nor invites disregard for the values the Establishment Clause was intended to protect. It simply recognizes the fundamental difficulty inherent in focusing on actual people: There is always *someone* who, with a particular quantum of knowledge, reasonably might perceive a particular action as an endorsement of religion. A State has not made religion relevant to standing in the political community simply because a particular viewer of a display might feel uncomfortable.

It is for this reason that the reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum in which the religious display appears. As I explained in *Allegheny*, "the 'history and ubiquity' of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion." 492 U. S., at 630. Nor can the knowledge attributed to the reasonable observer be limited to the information gleaned simply from viewing the challenged display. Today's proponents of the endorsement test all agree that we should attribute to the observer knowledge that the cross is a religious symbol, that

Capitol Square is owned by the State, and that the large building nearby is the seat of state government. See *post*, at 792–793 (SOUTER, J., concurring in part and concurring in judgment); *post*, at 806 (STEVENS, J., dissenting). In my view, our hypothetical observer also should know the general history of the place in which the cross is displayed. Indeed, the fact that Capitol Square is a public park that has been used over time by private speakers of various types is as much a part of the display's context as its proximity to the Ohio Statehouse. Cf. *Allegheny, supra,* at 600, n. 50 (noting that "[t]he Grand Staircase does not appear to be the kind of location in which all were free to place their displays for weeks at a time"). This approach does not require us to assume an "'ultrareasonable observer' who understands the vagaries of this Court's First Amendment jurisprudence," *post*, at 807 (STEVENS, J., dissenting). An informed member of the community will know how the public space in question has been used in the past—and it is that fact, not that the space may meet the legal definition of a public forum, which is relevant to the endorsement inquiry.

JUSTICE STEVENS' property-based argument fails to give sufficient weight to the fact that the cross at issue here was displayed in a forum traditionally open to the public. "The very fact that a sign is installed on public property," his dissent suggests, "implies official recognition and reinforcement of its message." *Post*, at 801. While this may be the case where a government building and its immediate curtilage are involved, it is not necessarily so with respect to those "places which by long tradition or by government fiat have been devoted to assembly and debate, . . . [particularly] streets and parks which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 45 (1983) (quoting *Hague* v. *Committee for Industrial Organization,* 307

U. S. 496, 515 (1939)). To the extent there is a presumption that "structures on government property—and, in particular, in front of buildings plainly identified with the State—imply state approval of their message," *post,* at 804 (STEVENS, J., dissenting), that presumption can be rebutted where the property at issue is a forum historically available for private expression. The reasonable observer would recognize the distinction between speech the government supports and speech that it merely allows in a place that traditionally has been open to a range of private speakers accompanied, if necessary, by an appropriate disclaimer.

In this case, I believe, the reasonable observer would view the Klan's cross display fully aware that Capitol Square is a public space in which a multiplicity of groups, both secular and religious, engage in expressive conduct. It is precisely this type of knowledge that we presumed in *Lamb's Chapel,* 508 U. S., at 395, and in *Mergens,* 496 U. S., at 250 (plurality opinion). Moreover, this observer would certainly be able to read and understand an adequate disclaimer, which the Klan had informed the State it would include in the display at the time it applied for the permit, see App. to Pet. for Cert. A15–A16; *post,* at 793–794, n. 1 (SOUTER, J., concurring in part and concurring in judgment), and the content of which the Board could have defined as it deemed necessary as a condition of granting the Klan's application. Cf. *American Civil Liberties Union* v. *Wilkinson,* 895 F. 2d 1098, 1104–1106 (CA6 1990). On the facts of this case, therefore, I conclude that the reasonable observer would not interpret the State's tolerance of the Klan's private religious display in Capitol Square as an endorsement of religion.

## III

"To be sure, the endorsement test depends on a sensitivity to the unique circumstances and context of a particular challenged practice and, like any test that is sensitive to context,

it may not always yield results with unanimous agreement at the margins." *Allegheny,* 492 U. S., at 629 (O'CONNOR, J., concurring in part and concurring in judgment). In my view, however, this flexibility is a virtue and not a vice; "courts must keep in mind both the fundamental place held by the Establishment Clause in our constitutional scheme and the myriad, subtle ways in which Establishment Clause values can be eroded," *Lynch,* 465 U. S., at 694 (O'CONNOR, J., concurring).

I agree that "compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech." *Ante,* at 761–762. The Establishment Clause "prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *Allegheny, supra,* at 593–594 (quoting *Lynch, supra,* at 687 (O'CONNOR, J., concurring)). Because I believe that, under the circumstances at issue here, allowing the Klan cross, along with an adequate disclaimer, to be displayed on Capitol Square presents no danger of doing so, I conclude that the State has not presented a compelling justification for denying respondents their permit.

JUSTICE SOUTER, with whom JUSTICE O'CONNOR and JUSTICE BREYER join, concurring in part and concurring in the judgment.

I concur in Parts I, II, and III of the Court's opinion. I also want to note specifically my agreement with the Court's suggestion that the State of Ohio could ban all unattended private displays in Capitol Square if it so desired. See *ante,* at 761; see also *post,* at 802–804 (STEVENS, J., dissenting). The fact that the capitol lawn has been the site of public protests and gatherings, and is the location of any number of the government's own unattended displays, such as statues, does

not disable the State from closing the square to all privately owned, unattended structures. A government entity may ban posters on publicly owned utility poles to eliminate visual clutter, *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 808 (1984), and may bar camping as part of a demonstration in certain public parks, *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288 (1984). It may similarly adopt a content-neutral policy prohibiting private individuals and groups from erecting unattended displays in forums around public buildings. See *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791 (1989) ("[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided [that] the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information,'" quoting *Clark, supra,* at 293).

Otherwise, however, I limit my concurrence to the judgment. Although I agree in the end that, in the circumstances of this case, petitioners erred in denying the Klan's application for a permit to erect a cross on Capitol Square, my analysis of the Establishment Clause issue differs from JUSTICE SCALIA's, and I vote to affirm in large part because of the possibility of affixing a sign to the cross adequately disclaiming any government sponsorship or endorsement of it.

The plurality's opinion declines to apply the endorsement test to the Board's action, in favor of a *per se* rule: religious expression cannot violate the Establishment Clause where it (1) is private and (2) occurs in a public forum, even if a reasonable observer would see the expression as indicating state endorsement. *Ante,* at 770. This *per se* rule would be an exception to the endorsement test, not previously recognized and out of square with our precedents.

I

My disagreement with the plurality on the law may receive some focus from attention to a matter of straight fact that we see alike: in some circumstances an intelligent observer may mistake private, unattended religious displays in a public forum for government speech endorsing religion. See *ante*, at 768 (acknowledging that "hypothetical observers may—*even reasonably*—confuse an incidental benefit to religion with state endorsement") (emphasis in original); see also *ante*, at 769, n. 4 (noting that an observer might be "misled" by the presence of the cross in Capitol Square if the disclaimer was of insufficient size or if the observer failed to enquire whether the State had sponsored the cross). The Klan concedes this possibility as well, saying that, in its view, "on a different set of facts, the government might be found guilty of violating the endorsement test by permitting a private religious display in a public forum." Brief for Respondents 43.

An observer need not be "obtuse," *Doe* v. *Small*, 964 F. 2d 611, 630 (CA7 1992) (Easterbrook, J., concurring), to presume that an unattended display on government land in a place of prominence in front of a government building either belongs to the government, represents government speech, or enjoys its location because of government endorsement of its message. Capitol Square, for example, is the site of a number of unattended displays owned or sponsored by the government, some permanent (statues), some temporary (such as the Christmas tree and a "Seasons Greetings" banner), and some in between (flags, which are, presumably, taken down and put up from time to time). See App. 59, 64–65 (photos); Appendices A and B to this opinion, *infra*. Given the domination of the square by the government's own displays, one would not be a dimwit as a matter of law to think that an unattended religious display there was endorsed by the government, even though the square has also been the site of three privately sponsored, unattended displays over the

years (a menorah, a United Way "thermometer," and some artisans' booths left overnight during an arts festival), *ante,* at 758, cf. *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S. 573, 600, n. 50 (1989) ("Even if the Grand Staircase occasionally was used for displays other than the crèche . . . , it remains true that any display located there fairly may be understood to express views that receive the support and endorsement of the government"), and even though the square meets the legal definition of a public forum and has been used "[f]or over a century" as the site of "speeches, gatherings, and festivals," *ante,* at 757. When an individual speaks in a public forum, it is reasonable for an observer to attribute the speech, first and foremost, to the speaker, while an unattended display (and any message it conveys) can naturally be viewed as belonging to the owner of the land on which it stands.

In sum, I do not understand that I am at odds with the plurality when I assume that in some circumstances an intelligent observer would reasonably perceive private religious expression in a public forum to imply the government's endorsement of religion. My disagreement with the plurality is simply that I would attribute these perceptions of the intelligent observer to the reasonable observer of Establishment Clause analysis under our precedents, where I believe that such reasonable perceptions matter.

## II

In *Allegheny,* the Court alluded to two elements of the analytical framework supplied by *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971), by asking "whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion." 492 U. S., at 592. We said that "the prohibition against governmental endorsement of religion 'preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred,'" *id.,* at 593, quoting *Wallace* v. *Jaf-*

*free,* 472 U. S. 38, 70 (1985) (O'CONNOR, J., concurring in judgment) (emphasis deleted), and held that "[t]he Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief," 492 U. S., at 593–594.

*Allegheny's* endorsement test cannot be dismissed, as JUSTICE SCALIA suggests, as applying only to situations in which there is an allegation that the Establishment Clause has been violated through "expression by the government itself" or "government action . . . discriminat[ing] in favor of private religious expression." *Ante,* at 764 (emphasis deleted). Such a distinction would, in all but a handful of cases, make meaningless the "effect-of-endorsing" part of *Allegheny's* test. Effects matter to the Establishment Clause, and one, principal way that we assess them is by asking whether the practice in question creates the appearance of endorsement to the reasonable observer. See *Allegheny, supra,* at 630, 635–636 (O'CONNOR, J., concurring in part and concurring in judgment); *Witters* v. *Washington Dept. of Servs. for Blind,* 474 U. S. 481, 493 (1986) (O'CONNOR, J., concurring in part and concurring in judgment); see also *Allegheny, supra,* at 593–594, 599–600 (majority opinion); *Lynch* v. *Donnelly,* 465 U. S. 668, 690 (1984) (O'CONNOR, J., concurring). If a reasonable observer would perceive a religious display in a government forum as government speech endorsing religion, then the display has made "religion relevant, in . . . public perception, to status in the political community." *Id.,* at 692 (O'CONNOR, J., concurring). Unless we are to retreat entirely to government intent and abandon consideration of effects, it makes no sense to recognize a public perception of endorsement as a harm only in that subclass of cases in which the government owns the display. Indeed, the Court stated in *Allegheny* that "once the judgment has been made that a particular proclamation of Christian belief, when disseminated from a particular location on government property, has the effect of demonstrating the government's endorsement

of Christian faith, then it necessarily follows that the practice must be enjoined." 492 U. S., at 612. Notably, we did not say that it was only a "particular government proclamation" that could have such an unconstitutional effect, nor does the passage imply anything of the kind.

The significance of the fact that the Court in *Allegheny* did not intend to lay down a *per se* rule in the way suggested by the plurality today has been confirmed by subsequent cases. In *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens*, 496 U. S. 226 (1990), six Justices applied the endorsement test to decide whether the Establishment Clause would be violated by a public high school's application of the Equal Access Act, Pub. L. 98–377, 98 Stat. 1302, 20 U. S. C. §§ 4071–4074, to allow students to form a religious club having the same access to meeting facilities as other "noncurricular" groups organized by students. A plurality of four Justices concluded that such an equal access policy "does not convey a message of state approval or endorsement of the particular religion" espoused by the student religious group. 496 U. S., at 252 (O'CONNOR, J., joined by REHNQUIST, C. J., and White and Blackmun, JJ.). Two others concurred in the judgment in order "to emphasize the steps [the school] must take to avoid appearing to endorse the [religious] club's goals." *Id.*, at 263 (opinion of Marshall, J., joined by Brennan, J.); see also *id.*, at 264 ("If public schools are perceived as conferring the *imprimatur* of the State on religious doctrine or practice as a result of such a policy, the nominally 'neutral' character of the policy will not save it from running afoul of the Establishment Clause") (emphasis in original).

What is important is that, even though *Mergens* involved private religious speech in a nondiscriminatory "'limited open forum,'" *id.*, at 233, 247, a majority of the Court reached the conclusion in the case not by applying an irrebuttable presumption, as the plurality does today, but by making a contextual judgment taking account of the circum-

stances of the specific case. See *id.*, at 250–252 (plurality opinion); *id.*, at 264–270 (opinion of Marshall, J., joined by Brennan, J.); cf. *Allegheny*, 492 U. S., at 629 (O'CONNOR, J., concurring in part and concurring in judgment) ("[T]he endorsement test depends on a sensitivity to the unique circumstances and context of a particular challenged practice"); *Lynch, supra*, at 694 (O'CONNOR, J., concurring) ("Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion"). The *Mergens* plurality considered the nature of the likely audience, 496 U. S., at 250 ("[S]econdary school students are mature enough . . . to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis"); the details of the particular forum, *id.*, at 252 (noting "the broad spectrum of officially recognized student clubs" at the school, and the students' freedom "to initiate and organize additional student clubs"); the presumptively secular nature of most student organizations, *ibid.* (" '[I]n the absence of empirical evidence that religious groups will dominate [the] . . . open forum, . . . the advancement of religion would not be the forum's "primary effect," ' " quoting *Widmar* v. *Vincent*, 454 U. S. 263, 275 (1981)); and the school's specific action or inaction that would disassociate itself from any religious message, 496 U. S., at 251 ("[N]o school officials actively participate" in the religious group's activities). The plurality, moreover, expressly relied on the fact that the school could issue a disclaimer specific to the religious group, concluding that "[t]o the extent a school makes clear that its recognition of [a religious student group] is not an endorsement . . . , students will reasonably understand that the . . . recognition of the club evinces neutrality toward, rather than endorsement of, religious speech." *Ibid.*; see also *id.*, at 270 (Marshall, J., concurring in judgment) (noting importance of schools "taking whatever further steps are necessary to make clear that their recognition of a religious club does

not reflect their endorsement of the views of the club's participants").

Similarly, in *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384 (1993), we held that an evangelical church, wanting to use public school property to show a series of films about child rearing with a religious perspective, could not be refused access to the premises under a policy that would open the school to other groups showing similar films from a nonreligious perspective. In reaching this conclusion, we expressly concluded that the policy would "not have the principal or primary effect of advancing or inhibiting religion." 508 U. S., at 395. Again we looked to the specific circumstances of the private religious speech and the public forum: the film would not be shown during school hours or be sponsored by the school, it would be open to the public, and the forum had been used "repeatedly" by "a wide variety" of other private speakers. *Ibid.* "Under these circumstances," we concluded, "there would have been no realistic danger that the community would think that the [school] was endorsing religion." *Ibid.* We thus expressly looked to the endorsement effects of the private religious speech at issue, notwithstanding the fact that there was no allegation that the Establishment Clause had been violated through active "expression by the government itself" or affirmative "government action . . . discriminat[ing] in favor of private religious expression." *Ante,* at 764 (emphasis deleted). Indeed, the issue of whether the private religious speech in a government forum had the effect of advancing religion was central, rather than irrelevant, to our Establishment Clause enquiry. This is why I agree with the Court that "[t]he *Lamb's Chapel* reasoning applies *a fortiori* here," *ante,* at 762.

*Widmar* v. *Vincent, supra,* is not to the contrary. Although *Widmar* was decided before our adoption of the endorsement test in *Allegheny,* its reasoning fits with such a test and not with the *per se* rule announced today. There, in determining whether it would violate the Establishment

Clause to allow private religious speech in a "generally open forum" at a university, 454 U. S., at 269, the Court looked to the *Lemon* test, 454 U. S., at 271, and focused on the "effects" prong, *id.*, at 272, in reaching a contextual judgment. It was relevant that university students "should be able to appreciate that the University's policy is one of neutrality toward religion," that students were unlikely, as a matter of fact, to "draw any reasonable inference of University support from the mere fact of a campus meeting place," and that the University's student handbook carried a disclaimer that the University should not "'be identified in any way with the . . . opinions of any [student] organization.'" *Id.*, at 274, n. 14. "In this context," *id.*, at 273, and in the "absence of empirical evidence that religious groups [would] dominate [the] open forum," *id.*, at 275, the Court found that the forum at issue did not "confer any imprimatur of state approval on religious sects or practices," *id.*, at 274.

Even if precedent and practice were otherwise, however, and there were an open question about applying the endorsement test to private speech in public forums, I would apply it in preference to the plurality's view, which creates a serious loophole in the protection provided by the endorsement test. In JUSTICE SCALIA's view, as I understand it, the Establishment Clause is violated in a public forum only when the government itself intentionally endorses religion or willfully "foster[s]" a misperception of endorsement in the forum, *ante*, at 766, or when it "manipulates" the public forum "in such a manner that only certain religious groups take advantage of it," *ibid.* If the list of forbidden acts is truly this short, then governmental bodies and officials are left with generous scope to encourage a multiplicity of religious speakers to erect displays in public forums. As long as the governmental entity does not "manipulat[e]" the forum in such a way as to exclude all other speech, the plurality's opinion would seem to invite such government encouragement, even when the result will be the domination of the

forum by religious displays and religious speakers. By allowing government to encourage what it cannot do on its own, the proposed *per se* rule would tempt a public body to contract out its establishment of religion, by encouraging the private enterprise of the religious to exhibit what the government could not display itself.

Something of the sort, in fact, may have happened here. Immediately after the District Court issued the injunction ordering petitioners to grant the Klan's permit, a local church council applied for a permit, apparently for the purpose of overwhelming the Klan's cross with other crosses. The council proposed to invite all local churches to erect crosses, and the Board granted "blanket permission" for "all churches friendly to or affiliated with" the council to do so. See Brief in Opposition RA24–RA26. The end result was that a part of the square was strewn with crosses, see Appendices A and B to this opinion, *infra*, at 795–796, and while the effect in this case may have provided more embarrassment than suspicion of endorsement, the opportunity for the latter is clear.

### III

As for the specifics of this case, one must admit that a number of facts known to the Board, or reasonably anticipated, weighed in favor of upholding its denial of the permit. For example, the Latin cross the Klan sought to erect is the principal symbol of Christianity around the world, and display of the cross alone could not reasonably be taken to have any secular point. It was displayed immediately in front of the Ohio Statehouse, with the government's flags flying nearby, and the government's statues close at hand. For much of the time the cross was supposed to stand on the square, it would have been the only private display on the public plot (the menorah's permit expired several days before the cross actually went up). See Pet. for Cert. A15–A16, A31; 30 F. 3d, at 677. There was nothing else on the state-

house lawn that would have suggested a forum open to any and all private, unattended religious displays.

Based on these and other factors, the Board was understandably concerned about a possible Establishment Clause violation if it had granted the permit. But a flat denial of the Klan's application was not the Board's only option to protect against an appearance of endorsement, and the Board was required to find its most "narrowly drawn" alternative, *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 45 (1983); see also *ante*, at 761. Either of two possibilities would have been better suited to this situation. In support of the Klan's application, its representative stated in a letter to the Board that the cross would be accompanied by a disclaimer, legible "from a distance," explaining that the cross was erected by private individuals "'without government support.'" App. 118. The letter said that "the contents of the sign" were "open to negotiation." *Ibid.*[1] The

---

[1] This description of the disclaimer, as well as the agreement to negotiate, also appeared in the Klan's District Court complaint, App. 26, and in stipulations of fact jointly filed in the District Court by both parties, *id.*, at 100, ¶ 32. The Klan conceded before the District Court that "the state could have required . . . a disclaimer" like the one proposed, Memorandum in Support of Temporary Restraining Order and Preliminary Injunction in No. C2–93–1162 (SD Ohio), p. 5, and the State assumed throughout the litigation that the display would include the disclaimer, see, *e. g.*, Memorandum of Defendants in Opposition to Plaintiffs's Motion for Temporary Restraining Order and for Preliminary Injunction in No. C2–93–1162 (SD Ohio), pp. 6, 21. Both parties considered the disclaimer as an integral part of the display that the Klan desired to place on Capitol Square. Thus the District Court's order, which did not expressly require the disclaimer in awarding the injunction, see Pet. for Cert. A26 ("Plaintiffs are entitled to an injunction requiring the defendants to issue a permit to erect a cross on Capitol Square"), cannot reasonably be read to mean that the disclaimer was unnecessary. Indeed, in both its findings of fact and conclusions of law, the District Court discussed the presence and importance of the disclaimer, see *id.*, at A15–A16 (findings of fact), A20, A22–A23 (conclusions of law), and the Klan itself understood that the District Court's order was

Board, then, could have granted the application subject to the condition that the Klan attach a disclaimer sufficiently large and clear to preclude any reasonable inference that the cross was there to "demonstrat[e] the government's allegiance to, or endorsement of, the Christian faith." *Allegheny*, 492 U. S., at 612.[2]   In the alternative, the Board could have instituted a policy of restricting all private, unattended displays to one area of the square, with a permanent sign marking the area as a forum for private speech carrying no endorsement from the State.

With such alternatives available, the Board cannot claim that its flat denial was a narrowly tailored response to the Klan's permit application and thus cannot rely on that denial as necessary to ensure that the State did not "appea[r] to take a position on questions of religious belief." *Id.*, at 594. For these reasons, I concur in the judgment.

---

based on the assumption that a disclaimer would accompany the cross, since the cross the Klan put up on the basis of the District Court's command in fact carried a disclaimer, see App. 63 (photo); Appendix to opinion of STEVENS, J., *post*, at 816.   Since the litigation preceded the appearance of the cross and the sign, the adequacy of the sign actually produced was not considered.   The adequacy of a disclaimer, in size as well as content, is, of course, a proper subject of judicial scrutiny when placed in issue. Whether the flimsy cardboard sign attached by the Klan to the base of the cross functioned as an adequate disclaimer in this case is a question not before us.

[2] Of course, the presence of a disclaimer does not always remove the possibility that a private religious display "convey[s] or attempt[s] to convey a message that religion or a particular religious belief is favored or preferred," *Allegheny*, 492 U. S., at 593 (emphasis, internal quotation marks, and citation omitted), when other indicia of endorsement (*e. g.*, objective indications that the government in fact invited the display or otherwise intended to further a religious purpose) outweigh the mitigating effect of the disclaimer, or when the disclaimer itself does not sufficiently disclaim government support.   See, *e. g., Stone* v. *Graham*, 449 U. S. 39, 41 (1980); *Allegheny, supra*, at 600–601; cf. *ante*, at 769, n. 4.   In this case, however, there is no reason to presume that an adequate disclaimer could not have been drafted.   Cf. Parish, Private Religious Displays in Public Fora, 61 U. Chi. L. Rev. 253, 285–287 (1994).

APPENDIX A TO OPINION OF SOUTER, J.

APPENDIX B TO OPINION OF SOUTER, J.

JUSTICE STEVENS, dissenting.

The Establishment Clause should be construed to create a strong presumption against the installation of unattended religious symbols on public property. Although the State of Ohio has allowed Capitol Square, the area around the seat of its government, to be used as a public forum, and although it has occasionally allowed private groups to erect other sectarian displays there, neither fact provides a sufficient basis for rebutting that presumption. On the contrary, the sequence of sectarian displays disclosed by the record in this case illustrates the importance of rebuilding the "wall of separation between church and State" that Jefferson envisioned.[1]

## I

At issue in this case is an unadorned Latin cross, which the Ku Klux Klan placed, and left unattended, on the lawn in front of the Ohio State Capitol. The Court decides this case on the assumption that the cross was a religious symbol. I agree with that assumption notwithstanding the hybrid character of this particular object. The record indicates that the "Grand Titan of the Knights of the Ku Klux Klan for the Realm of Ohio" applied for a permit to place a cross in front of the state capitol because " 'the Jews' " were placing a "symbol for the Jewish belief" in the square. App. 173.[2] Some observers, unaware of who had sponsored the cross, or unfamiliar with the history of the Klan and its reaction to the menorah, might interpret the Klan's cross as an inspirational symbol of the crucifixion and resurrection of Jesus Christ.

---

[1] See *Reynolds* v. *United States*, 98 U. S. 145, 164 (1879).

[2] The "Grand Titan" apparently was referring to a menorah that a private group placed in the square during the season of Chanukah. App. 98; see *infra*, at 808–809. The Klan found the menorah offensive. The Klan's cross, in turn, offended a number of observers. It was vandalized the day after it was erected, and a local church group applied for, and was granted, permission to display its own crosses around the Klan's to protest the latter's presence. See Record 31.

More knowledgeable observers might regard it, given the context, as an antisemitic symbol of bigotry and disrespect for a particular religious sect. Under the first interpretation, the cross is plainly a religious symbol.[3] Under the second, an icon of intolerance expressing an anticlerical message should also be treated as a religious symbol because the Establishment Clause must prohibit official sponsorship of irreligious as well as religious messages. See *Wallace* v. *Jaffree*, 472 U. S. 38, 52 (1985). This principle is no less binding if the antireligious message is also a bigoted message. See *United States* v. *Ballard*, 322 U. S. 78, 86–89 (1944) (government lacks power to judge truth of religious beliefs); *Watson* v. *Jones*, 13 Wall. 679, 728 (1872) ("The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect").

Thus, while this unattended, freestanding wooden cross was unquestionably a religious symbol, observers may well have received completely different messages from that symbol. Some might have perceived it as a message of love, others as a message of hate, still others as a message of exclusion—a statehouse sign calling powerfully to mind their outsider status. In any event, it was a message that the State of Ohio may not communicate to its citizens without violating the Establishment Clause.

---

[3] Indeed, the Latin cross is identifiable as a symbol of a particular religion, that of Christianity; and, further, as a symbol of particular denominations within Christianity. See *American Civil Liberties Union* v. *St. Charles*, 794 F. 2d 265, 271 (CA7 1986) ("Such a display is not only religious but also sectarian. This is not just because some religious Americans are not Christians. Some Protestant sects still do not display the cross . . . . The Greek Orthodox church uses as its symbol the Greek (equilateral) cross, not the Latin cross. . . . [T]he more sectarian the display, the closer it is to the original targets of the [establishment] clause, so the more strictly is the clause applied").

## II

The plurality does not disagree with the proposition that the State may not espouse a religious message. *Ante*, at 765–766. It concludes, however, that the State has not sent such a message; it has merely allowed others to do so on its property. Thus, the State has provided an "incidental benefit" to religion by allowing private parties access to a traditional public forum. See *ante*, at 765. In my judgment, neither precedent nor respect for the values protected by the Establishment Clause justifies that conclusion.

The Establishment Clause, "at the very least, prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 593–594 (1989), quoting *Lynch v. Donnelly*, 465 U. S. 668, 687 (1984) (O'CONNOR, J., concurring). At least when religious symbols are involved, the question whether the State is "appearing to take a position" is best judged from the standpoint of a "reasonable observer."[4] It is especially important to take account of the perspective of a reasonable observer who may not share the particular religious belief it expresses. A paramount purpose of the Establishment Clause is to protect such a person from being made to feel like an outsider in matters of faith, and a stranger in the political community. *Ibid.* If a reasonable person could perceive a government endorsement of religion from a private display, then the State may not allow its property to be used as a forum for that display. No less stringent rule can ade-

---

[4] In *Allegheny*, five Justices found the likely reaction of a "'reasonable observer'" relevant for purposes of determining whether an endorsement was present. 492 U. S., at 620 (opinion of Blackmun, J.); *id.*, at 635–636 (opinion of O'CONNOR, J.); *id.*, at 642–643 (opinion of Brennan, J., joined by Marshall and STEVENS, JJ.).

quately prot:::t nonadherents from a well-grounded perception that their sovereign supports a faith to which they do not subscribe.[5]

In determining whether the State's maintenance of the Klan's cross in front of the statehouse conveyed a forbidden message of endorsement, we should be mindful of the power of a symbol standing alone and unexplained. Even on private property, signs and symbols are generally understood to express the owner's views. The location of the sign is a significant component of the message it conveys.

> "Displaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means. Precisely because of their location, such signs provide information about the identity of the 'speaker.' As an early and eminent student of rhetoric observed, the identity of the speaker is an important component of many attempts to persuade. A sign advo-

---

[5] JUSTICE O'CONNOR agrees that an "endorsement test" is appropriate and that we should judge endorsement from the standpoint of a reasonable observer. *Ante*, at 779. But her reasonable observer is a legal fiction, "'a personification of a community ideal of reasonable behavior, determined by the [collective] social judgment.'" *Ante*, at 780. The ideal human JUSTICE O'CONNOR describes knows and understands much more than meets the eye. Her "reasonable person" comes off as a well-schooled jurist, a being finer than the tort-law model. With respect, I think this enhanced tort-law standard is singularly out of place in the Establishment Clause context. It strips of constitutional protection every reasonable person whose knowledge happens to fall below some "'ideal'" standard. Instead of protecting only the "'ideal'" observer, then, I would extend protection to the universe of reasonable persons and ask whether some viewers of the religious display would be likely to perceive a government endorsement.

JUSTICE O'CONNOR's argument that "[t]here is always *someone*" who will feel excluded by any particular governmental action, *ibid.*, ignores the requirement that such an apprehension be objectively reasonable. A person who views an exotic cow at the zoo as a symbol of the government's approval of the Hindu religion cannot survive this test.

cating 'Peace in the Gulf' in the front lawn of a retired general or decorated war veteran may provoke a different reaction than the same sign in a 10-year-old child's bedroom window or the same message on a bumper sticker of a passing automobile. An espousal of socialism may carry different implications when displayed on the grounds of a stately mansion than when pasted on a factory wall or an ambulatory sandwich board." *City of Ladue* v. *Gilleo,* 512 U. S. 43, 56–57 (1994) (footnote omitted).

Like other speakers, a person who places a sign on her own property has the autonomy to choose the content of her own message. Cf. *McIntyre* v. *Ohio Elections Comm'n,* 514 U. S. 334, 341–342 (1995). Thus, the location of a stationary, unattended sign generally is both a component of its message and an implicit endorsement of that message by the party with the power to decide whether it may be conveyed from that location.[6]

So it is with signs and symbols left to speak for themselves on public property. The very fact that a sign is installed on public property implies official recognition and reinforcement of its message. That implication is especially strong when the sign stands in front of the seat of the government itself. The "reasonable observer" of any symbol placed unattended in front of any capitol in the world will normally assume that the sovereign—which is not only the owner of that parcel of real estate but also the lawgiver for

---

[6] I recognize there may be exceptions to this general rule. A commercial message displayed on a billboard, for example, usually will not be taken to represent the views of the billboard's owner because every reasonable observer is aware that billboards are rented as advertising space. On the other hand, the observer may reasonably infer that the owner of the billboard is not inalterably opposed to the message presented thereon; for the owner has the right to exclude messages with which he disagrees, and he might be expected to exercise that right if his disagreement is sufficiently profound.

the surrounding territory—has sponsored and facilitated its message.

That the State may have granted a variety of groups permission to engage in uncensored expressive activities in front of the capitol building does not, in my opinion, qualify or contradict the normal inference of endorsement that the reasonable observer would draw from the unattended, free-standing sign or symbol. Indeed, parades and demonstrations at or near the seat of government are often exercises of the right of the people to petition their government for a redress of grievances—exercises in which the government is the recipient of the message rather than the messenger. Even when a demonstration or parade is not directed against government policy, but merely has made use of a particularly visible forum in order to reach as wide an audience as possible, there usually can be no mistake about the identity of the messengers as persons other than the State. But when a statue or some other freestanding, silent, unattended, immoveable structure—regardless of its particular message—appears on the lawn of the capitol building, the reasonable observer must identify the State either as the messenger, or, at the very least, as one who has endorsed the message. Contrast, in this light, the image of the cross standing alone and unattended, see *infra*, at 816, and the image the observer would take away were a hooded Klansman holding, or standing next to, the very same cross.

This Court has never held that a private party has a right to place an unattended object in a public forum.[7] Today the

---

[7] Despite the absence of any holding on this point, JUSTICE O'CONNOR assumes that a reasonable observer would not impute the content of an unattended display to the government because that observer would know that the State is required to allow all such displays on Capitol Square. *Ante,* at 780–781. JUSTICE O'CONNOR thus presumes a reasonable observer so prescient as to understand legal doctrines that this Court has not yet adopted.

Court correctly recognizes that a State may impose a ban on all private unattended displays in such a forum, *ante*, at 761. This is true despite the fact that our cases have condemned a number of laws that foreclose an entire medium of expression, even in places where free speech is otherwise allowed.[8] The First Amendment affords protection to a basic liberty: "the freedom of speech" that an individual may exercise when using the public streets and parks. *Hague* v. *Committee for Industrial Organization*, 307 U. S. 496, 515–516 (1939) (opinion of Roberts, J.). The Amendment, however, does not destroy all property rights. In particular, it does not empower individuals to erect structures of any kind on public property. *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 814 (1984);[9] see also

---

[8] "Our prior decisions have voiced particular concern with laws that foreclose an entire medium of expression. Thus, we have held invalid ordinances that completely banned the distribution of pamphlets within the municipality, *Lovell* v. *Griffin*, 303 U. S. 444, 451–452 (1938); handbills on the public streets, *Jamison* v. *Texas*, 318 U. S. 413, 416 (1943); the door-to-door distribution of literature, *Martin* v. *Struthers*, 319 U. S. 141, 145–149 (1943); *Schneider* v. *State*, 308 U. S. 147, 164–165 (1939), and live entertainment, *Schad* v. *Mount Ephraim*, 452 U. S. 61, 75–76 (1981). See also *Frisby* v. *Schultz*, 487 U. S. 474, 486 (1988) (picketing focused upon individual residence is 'fundamentally different from more generally directed means of communication that may not be completely banned in residential areas'). Although prohibitions foreclosing entire media may be completely free of content or viewpoint discrimination, the danger they pose to the freedom of speech is readily apparent—by eliminating a common means of speaking, such measures can suppress too much speech." *City of Ladue* v. *Gilleo*, 512 U. S. 43, 55 (1994) (footnote omitted).

[9] In *Vincent*, we stated:

"Appellees' reliance on the public forum doctrine is misplaced. They fail to demonstrate the existence of a traditional right of access respecting such items as utility poles for purposes of their communication comparable to that recognized for public streets and parks, and it is clear that 'the First Amendment does not guarantee access to government property simply because it is owned or controlled by the government.' *United States Postal Service* v. *Greenburgh Civic Assns.*, 453 U. S. 114, 129

*Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288 (1984).   Thus, our cases protecting the individual's freedom to engage in communicative conduct on public property (whether by speaking, parading, handbilling, waving a flag, or carrying a banner), *e. g., Lovell* v. *City of Griffin*, 303 U. S. 444 (1938), or to send messages from her own property by placing a sign in the window of her home, *City of Ladue* v. *Gilleo*, 512 U. S., at 58–59, do not establish the right to implant a physical structure (whether a campaign poster, a burning cross, or a statue of Elvis Presley) on public property.   I think the latter "right," which creates a far greater intrusion on government property and interferes with the government's ability to differentiate its own message from those of public individuals, does not exist.[10]

Because structures on government property—and, in particular, in front of buildings plainly identified with the State—imply state approval of their message, the government must have considerable leeway, outside of the religious arena, to choose what kinds of displays it will allow and what kinds it will not.   Although the First Amendment requires the government to allow leafletting or demonstrating outside its buildings, the State has greater power to exclude unattended symbols when they convey a type of message with which the State does not wish to be identified.   I think it obvious, for example, that Ohio could prohibit certain categories of signs or symbols in Capitol Square—erotic exhibits, commercial advertising, and perhaps campaign posters as

---

(1981).   Rather, the 'existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue.'   *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 44 (1983)."   466 U. S., at 814.

[10] At least, it does not exist as a general matter.   I recognize there may be cases of viewpoint discrimination (say, if the State were to allow campaign signs supporting an incumbent governor but not signs supporting his opponent) in which access cannot be discriminatorily denied.

well—without violating the Free Speech Clause.[11] More-
over, our "public forum" cases do not foreclose public entities
from enforcing prohibitions against all unattended displays
in public parks, or possibly even limiting the use of such dis-
plays to the communication of noncontroversial messages.[12]
Such a limitation would not inhibit any of the traditional
forms of expression that have been given full constitutional
protection in public fora.

The State's general power to restrict the types of unat-
tended displays does not alone suffice to decide this case,
because Ohio did not profess to be exercising any such au-
thority. Instead, the Capitol Square Review Board denied
a permit for the cross because it believed the Establishment
Clause required as much, and we cannot know whether the

---

[11] The plurality incorrectly assumes that a decision to exclude a category
of speech from an inappropriate forum must rest on a judgment about the
value of that speech. See *ante,* at 766–767. Yet, we have upheld the
exclusion of all political signs from public vehicles, *Lehman* v. *Shaker
Heights,* 418 U. S. 298 (1974), though political expression is at the heart
of the protection afforded by the First Amendment. *McIntyre* v. *Ohio
Elections Comm'n,* 514 U. S. 334, 346–347 (1995). A view that "private
prayers," *ante,* at 767, are most appropriate in private settings is neither
novel nor disrespectful to religious speech.

[12] Several scholars have commented on the malleability of our public
forum precedents.

"As [an] overview of the cases strongly suggests, whether or not a given
place is deemed a 'public forum' is ordinarily less significant than the
nature of the speech restriction—despite the Court's rhetoric. Indeed,
even the rhetoric at times reveals as much.

.    .    .    .    .

"Beyond confusing the issues, an excessive focus on the public character
of some forums, coupled with inadequate attention to the precise details
of the restrictions on expression, can leave speech inadequately protected
in some cases, while unduly hampering state and local authorities in
others." L. Tribe, American Constitutional Law 992–993 (2d ed. 1988)
(footnotes omitted).

See also Farber & Nowak, The Misleading Nature of Public Forum
Analysis: Content and Context in First Amendment Adjudication, 70 Va.
L. Rev. 1219, 1221–1222 (1984).

Board would have denied the permit on other grounds. App. 91–92, 169. Accordingly, we must evaluate the State's rationale on its own terms. But in this case, the endorsement inquiry under the Establishment Clause follows from the State's power to exclude unattended private displays from public property. Just as the Constitution recognizes the State's interest in preventing its property from being used as a conduit for ideas it does not wish to give the appearance of ratifying, the Establishment Clause prohibits government from allowing, and thus endorsing, unattended displays that take a position on a religious issue. If the State allows such stationary displays in front of its seat of government, viewers will reasonably assume that it approves of them. As the picture appended to this opinion demonstrates, *infra*, at 816, a reasonable observer would likely infer endorsement from the location of the cross erected by the Klan in this case. Even if the disclaimer at the foot of the cross (which stated that the cross was placed there by a private organization) were legible, that inference would remain, because a property owner's decision to allow a third party to place a sign on her property conveys the same message of endorsement as if she had erected it herself.[13]

When the message is religious in character, it is a message the State can neither send nor reinforce without violating the Establishment Clause. Accordingly, I would hold that the Constitution generally forbids the placement of a

-------

[13] Indeed, I do not think *any* disclaimer could dispel the message of endorsement in this case. Capitol Square's location in downtown Columbus, Ohio, makes it inevitable that countless motorists and pedestrians would immediately perceive the proximity of the cross to the capitol without necessarily noticing any disclaimer of public sponsorship. The plurality thus correctly abjures inquiry into the possible adequacy or significance of a legend identifying the owner of the cross. See *ante*, at 769, n. 4. JUSTICE SOUTER is of the view that an adequate disclaimer is constitutionally required, *ante*, at 793–794, but he does not suggest that the attachment to the Klan's cross in this case was adequate.

symbol of a religious character in, on, or before a seat of government.

## III

The Court correctly acknowledges that the State's duty to avoid a violation of the Establishment Clause can justify a content-based restriction on speech or expression, even when that restriction would otherwise be prohibited by the Free Speech Clause. *Ante,* at 761–762; *ante,* at 783 (opinion of O'CONNOR, J.). The plurality asserts, however, that government cannot be perceived to be endorsing a religious display when it merely accords that display "the same access to a public forum that all other displays enjoy." *Ante,* at 764. I find this argument unpersuasive.

The existence of a "public forum" in itself cannot dispel the message of endorsement. A contrary argument would assume an "ultrareasonable observer" who understands the vagaries of this Court's First Amendment jurisprudence. I think it presumptuous to consider such knowledge a precondition of Establishment Clause protection. Many (probably most) reasonable people do not know the difference between a "public forum," a "limited public forum," and a "nonpublic forum." They *do* know the difference between a state capitol and a church. Reasonable people have differing degrees of knowledge; that does not make them " 'obtuse,' " see 30 F. 3d 675, 679 (CA6 1994) (quoting *Doe* v. *Small,* 964 F. 2d 611, 630 (CA7 1992) (Easterbrook, J., concurring)); nor does it make them unworthy of constitutional protection. It merely makes them human. For a religious display to violate the Establishment Clause, I think it is enough that *some* reasonable observers would attribute a religious message to the State.

The plurality appears to rely on the history of this particular public forum—specifically, it emphasizes that Ohio has in the past allowed three other private unattended displays. Even if the State could not reasonably have been understood to endorse the prior displays, I would not find this argument

convincing, because it assumes that all reasonable viewers know all about the history of Capitol Square—a highly unlikely supposition.[14] But the plurality's argument fails on its own terms, because each of the three previous displays conveyed the same message of approval and endorsement that this one does.

Most significant, of course, is the menorah that stood in Capitol Square during Chanukah. The display of that religious symbol should be governed by the same rule as the display of the cross.[15] In my opinion, both displays are

---

[14] JUSTICE O'CONNOR apparently would not extend Establishment Clause protection to passersby who are unaware of Capitol Square's history. See *ante*, at 780–782. Thus, she sees no reason to distinguish an intimate knowledge of the square's history from the knowledge that a cross is a religious symbol or that the statehouse is the statehouse. *Ante*, at 780–781. But passersby, including schoolchildren, traveling salesmen, and tourists as much as those who live next to the statehouse, are members of the body politic, and they are equally entitled to be free from government endorsement of religion.

[15] A fragmented Court reached a different conclusion in *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573 (1989). In that case, a majority of this Court decided that a crèche placed by a private group inside a public building violated the Establishment Clause, *id.*, at 598–602, but that a menorah placed alongside a Christmas tree and a "sign saluting liberty" outside that same building did not. *Id.*, at 613–621 (opinion of Blackmun, J.); *id.*, at 632–637 (opinion of O'CONNOR, J.); *id.*, at 663–667 (opinion of KENNEDY, J., joined by REHNQUIST, C. J., and White and SCALIA, JJ.). The two Justices who provided the decisive votes to distinguish these situations relied on the presence of the tree and the sign to find that the menorah, in context, was not a religious, but a secular, symbol of liberty. *Id.*, at 613–621 (opinion of Blackmun, J.); *id.*, at 632–637 (opinion of O'CONNOR, J.). It was apparently in reliance on the outcome of the *Allegheny* case that Ohio believed it could provide a forum for the menorah (which appeared in Capitol Square with a state-owned Christmas tree and a banner reading, "Season's Greetings") and yet could not provide one for the cross. See App. 169. Given the state of the law at the time, Ohio's decision was hardly unreasonable; but I cannot support a view of the Establishment Clause that permits a State effectively to endorse some kinds of religious symbols but not others. I

equally objectionable. Moreover, the fact that the State has placed its stamp of approval on two different religions instead of one only compounds the constitutional violation. The Establishment Clause does not merely prohibit the State from favoring one religious sect over others. It also proscribes state action supporting the establishment of a number of religions,[16] as well as the official endorsement of religion in preference to nonreligion. *Wallace* v. *Jaffree*, 472 U. S., at 52–55. The State's prior approval of the pro-religious message conveyed by the menorah is fully consistent with its endorsement of one of the messages conveyed by the cross: "The State of Ohio favors religion over irreligion." This message is incompatible with the principles embodied by our Establishment Clause.

The record identifies two other examples of freestanding displays that the State previously permitted in Capitol Square: a "United Way Campaign 'thermometer,'" and "craftsmen's booths and displays erected during an Arts Festival."[17] App. to Pet. for Cert. A16. Both of those examples confirm the proposition that a reasonable observer should infer official approval of the message conveyed by a structure erected in front of the statehouse. Surely the thermometer suggested that the State was encouraging passersby to contribute to the United Way. It seems equally clear that the State was endorsing the creativity of artisans and craftsmen by permitting their booths to occupy a part of the square. Nothing about either of those freestanding displays contradicts the normal inference that the State has endorsed whatever message might be conveyed by permit-

---

would find that the State is powerless to place, or allow to be placed, any religious symbol—including a menorah or a cross—in front of its seat of government.

[16] See *Allegheny*, 492 U. S., at 647–649 (STEVENS, J., dissenting).

[17] The booths were attended during the festival itself, but were left standing overnight during the pendency of the event. App. 159.

ting an unattended symbol to adorn the capitol grounds.[18] Accordingly, the fact that the menorah, and later the cross, stood in an area available " 'for free discussion of public questions, or for activities of a broad public purpose,' " Ohio Rev. Code Ann. § 105.41 (1994), quoted *ante*, at 757, is fully consistent with the conclusion that the State sponsored those religious symbols. They, like the thermometer and the booths, were displayed in a context that connotes state approval.

This case is therefore readily distinguishable from *Widmar* v. *Vincent*, 454 U. S. 263 (1981), and *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384 (1993). In both of those cases, as we made perfectly clear, there was no danger of incorrect identification of the speakers and no basis for inferring that their messages had been endorsed by any public entity. As we explained in the later case:

> "Under these circumstances, as in *Widmar*, there would have been no realistic danger that the community would think that the District was endorsing religion or any particular creed, and any benefit to religion or to the Church would have been no more than incidental. As in *Widmar*, *supra*, at 271–272, permitting District property to be used to exhibit the film involved in this case would not have been an establishment of religion under the three-part test articulated in *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971): The challenged governmental action has a secular purpose, does not have the principal or primary effect of advancing or inhibiting religion, and does not foster an excessive entanglement with religion." *Id.*, at 395 (footnote omitted).

In contrast, the installation of the religious symbols in Capitol Square quite obviously did "have the principal or

---

[18] Of course, neither of these endorsements was religious in nature, and thus neither was forbidden by the Constitution.

primary effect of advancing or inhibiting religion"; indeed, no other effect is even suggested by the record. The primary difference is that in this case we are dealing with a *visual display*—a symbol readily associated with a religion, in a venue readily associated with the State. This clear image of endorsement was lacking in *Widmar* and *Lamb's Chapel*, in which the issue was access to government facilities. Moreover, there was no question in those cases of an unattended display; private speakers, who could be distinguished from the State, were present. See *supra*, at 801–802. Endorsement might still be present in an access case if, for example, the religious group sought the use of the roof of a public building for an obviously religious ceremony, where many onlookers might witness that ceremony and connect it to the State. But no such facts were alleged in *Widmar* or *Lamb's Chapel*. The religious practices in those cases were simply less obtrusive, and less likely to send a message of endorsement, than the eye-catching symbolism at issue in this case.

The battle over the Klan cross underscores the power of such symbolism. The menorah prompted the Klan to seek permission to erect an antisemitic symbol, which in turn not only prompted vandalism but also motivated other sects to seek permission to place their own symbols in the square. These facts illustrate the potential for insidious entanglement that flows from state-endorsed proselytizing. There is no reason to believe that a menorah placed in front of a synagogue would have motivated any reaction from the Klan, or that a Klan cross placed on a Klansman's front lawn would have produced the same reaction as one that enjoyed the apparent imprimatur of the State of Ohio. Nor is there any reason to believe the placement of the displays in Capitol Square had any purpose other than to connect the State— though perhaps against its will—to the religious or antireligious beliefs of those who placed them there. The cause of the conflict is the State's apparent approval of a religious

or antireligious message.[19]  Our Constitution wisely seeks to minimize such strife by forbidding state-endorsed religious activity.

IV

Conspicuously absent from the plurality's opinion is any mention of the values served by the Establishment Clause. It therefore seems appropriate to repeat a portion of a Court opinion authored by Justice Black who, more than any other Justice in the Court's history, espoused a literal interpretation of constitutional text:

> "A large proportion of the early settlers of this country came here from Europe to escape the bondage of laws which compelled them to support and attend government-favored churches.  The centuries immedi-

---

[19] As I stated in *Allegheny:*

"There is always a risk that such symbols will offend nonmembers of the faith being advertised as well as adherents who consider the particular advertisement disrespectful.  Some devout Christians believe that the crèche should be placed only in reverential settings, such as a church or perhaps a private home; they do not countenance its use as an aid to commercialization of Christ's birthday.  In this very suit, members of the Jewish faith firmly opposed the use to which the menorah was put by the particular sect that sponsored the display at Pittsburgh's City-County Building.  Even though '[p]assersby who disagree with the message conveyed by these displays are free to ignore them, or even to turn their backs,' displays of this kind inevitably have a greater tendency to emphasize sincere and deeply felt differences among individuals than to achieve an ecumenical goal.  The Establishment Clause does not allow public bodies to foment such disagreement."  492 U. S., at 650–651 (opinion concurring in part and dissenting in part) (citations omitted), quoting *id.,* at 664 (KENNEDY, J., concurring in judgment in part and dissenting in part).

In the words of Clarence Darrow:

"'The realm of religion . . . is where knowledge leaves off, and where faith begins, and it never has needed the arm of the State for support, and wherever it has received it, it has harmed both the public and the religion that it would pretend to serve.'"  Tr. of Oral Arg. 7, *Scopes* v. *State,* 154 Tenn. 105, 289 S. W. 363 (1927), quoted in *Wolman* v. *Walter,* 433 U. S. 229, 264 (1977) (opinion of STEVENS, J.).

ately before and contemporaneous with the colonization of America had been filled with turmoil, civil strife, and persecutions, generated in large part by established sects determined to maintain their absolute political and religious supremacy. With the power of government supporting them, at various times and places, Catholics had persecuted Protestants, Protestants had persecuted Catholics, Protestant sects had persecuted other Protestant sects, Catholics of one shade of belief had persecuted Catholics of another shade of belief, and all of these had from time to time persecuted Jews. In efforts to force loyalty to whatever religious group happened to be on top and in league with the government of a particular time and place, men and women had been fined, cast in jail, cruelly tortured, and killed. Among the offenses for which these punishments had been inflicted were such things as speaking disrespectfully of the views of ministers of government-established churches, non-attendance at those churches, expressions of non-belief in their doctrines, and failure to pay taxes and tithes to support them.

"These practices of the old world were transplanted to and began to thrive in the soil of the new America. The very charters granted by the English Crown to the individuals and companies designated to make the laws which would control the destinies of the colonials authorized these individuals and companies to erect religious establishments which all, whether believers or non-believers, would be required to support and attend. An exercise of this authority was accompanied by a repetition of many of the old-world practices and persecutions. Catholics found themselves hounded and proscribed because of their faith; Quakers who followed their conscience went to jail; Baptists were peculiarly obnoxious to certain dominant Protestant sects; men and women of varied faiths who happened to be in a

minority in a particular locality were persecuted because they steadfastly persisted in worshipping God only as their own consciences dictated. And all of these dissenters were compelled to pay tithes and taxes to support government-sponsored churches whose ministers preached inflammatory sermons designed to strengthen and consolidate the established faith by generating a burning hatred against dissenters.

.     .     .     .     .     .

"The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. . . . Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa*. In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between church and State.'" *Everson* v. *Board of Ed. of Ewing,* 330 U. S. 1, 8–10, 15, 16 (1947) (footnotes and citation omitted).

In his eloquent dissent in that same case, Justice Jackson succinctly explained—

"that the effect of the religious freedom Amendment to our Constitution was to take every form of propagation of religion out of the realm of things which could directly or indirectly be made public business . . . . It was intended not only to keep the states' hands out of religion, but to keep religion's hands off the state, and, above all, to keep bitter religious controversy out of public life . . . ." *Id.,* at 26–27.

The wrestling over the Klan cross in Capitol Square is far removed from the persecution that motivated William Penn to set sail for America, and the issue resolved in *Everson* is quite different from the controversy over symbols that gave rise to this litigation.[20]  Nevertheless, the views expressed by both the majority and the dissenters in that landmark case counsel caution before approving the order of a federal judge commanding a State to authorize the placement of freestanding religious symbols in front of the seat of its government.  The Court's decision today is unprecedented.  It entangles two sovereigns in the propagation of religion, and it disserves the principle of tolerance that underlies the prohibition against state action "respecting an establishment of religion."[21]

I respectfully dissent.

[Appendix to opinion of STEVENS, J., follows this page.]

---

[20] *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1 (1947), held that a school district could, as part of a larger program of reimbursing students for their transportation to and from school, also reimburse students attending Catholic schools.

[21] The words "respecting an establishment of religion" were selected to emphasize the breadth and richer meaning of this fundamental command. See *Allegheny*, 492 U. S., at 647–649 (STEVENS, J., dissenting).

APPENDIX TO OPINION OF STEVENS, J.

JUSTICE GINSBURG, dissenting.

We confront here, as JUSTICES O'CONNOR and SOUTER point out, a large Latin cross that stood alone and unattended in close proximity to Ohio's Statehouse. See *ante*, at 776 (O'CONNOR, J., concurring in part and concurring in judgment); *ante*, at 792–793 (SOUTER, J., concurring in part and concurring in judgment). Near the stationary cross were the government's flags and the government's statues. No human speaker was present to disassociate the religious symbol from the State. No other private display was in sight. No plainly visible sign informed the public that the cross belonged to the Klan and that Ohio's government did not endorse the display's message.

If the aim of the Establishment Clause is genuinely to uncouple government from church, see *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 16 (1947), a State may not permit, and a court may not order, a display of this character. Cf. Sullivan, Religion and Liberal Democracy, 59 U. Chi. L. Rev. 195, 197–214 (1992) (negative bar against establishment of religion implies affirmative establishment of secular public order). JUSTICE SOUTER, in the final paragraphs of his opinion, suggests two arrangements that might have distanced the State from "the principal symbol of Christianity around the world," see *ante*, at 792: a sufficiently large and clear disclaimer, *ante*, at 793–794;[1] or an area reserved for un-

---

[1] Cf. *American Civil Liberties Union* v. *Wilkinson*, 895 F. 2d 1098, 1101, n. 2, 1106 (CA6 1990) (approving disclaimer ordered by District Court, which had to be "'prominently displayed immediately in front of'" the religious symbol and "'readable from an automobile passing on the street directly in front of the structure'"; the approved sign read: "'This display was not constructed with public funds and does not constitute an endorsement by the Commonwealth [of Kentucky] of any religion or religious doctrine.'") (quoting District Court); *McCreary* v. *Stone*, 739 F. 2d 716, 728 (CA2 1984) (disclaimers must meet requirements of size, visibility, and message; disclaimer at issue was too small), aff'd, 471 U. S. 83 (1985) *(per curiam);* Parish, Private Religious Displays in Public Fora, 61 U. Chi. L. Rev. 253, 285–286 (1994) (disclaimer must not only identify the sponsor, it

attended displays carrying no endorsement from the State, a space plainly and permanently so marked, *ante,* at 794. Neither arrangement is even arguably present in this case. The District Court's order did not mandate a disclaimer. See App. to Pet. for Cert. A26 ("Plaintiffs are entitled to an injunction requiring the defendants to issue a permit to erect a cross on Capitol Square"). And the disclaimer the Klan appended to the foot of the cross[2] was unsturdy: It did not identify the Klan as sponsor; it failed to state unequivocally that Ohio did not endorse the display's message; and it was not shown to be legible from a distance. The relief ordered by the District Court thus violated the Establishment Clause.

Whether a court order allowing display of a cross, but demanding a sturdier disclaimer, could withstand Establishment Clause analysis is a question more difficult than the one this case poses. I would reserve that question for another day and case. But I would not let the prospect of what might have been permissible control today's decision on the constitutionality of the display the District Court's order in fact authorized. See *ante,* at 816 (appendix to dissent of STEVENS, J.) (photograph of display).

---

must say "in no uncertain language" that the government's permit "in no way connotes [government] endorsement of the display's message"; the "disclaimer's adequacy should be measured by its visibility to the average person viewing the religious display").

[2] The disclaimer stated: "'[T]his cross was erected by private individuals without government support for the purpose of expressing respect for the holiday season and to assert the right of all religious views to be expressed on an equal basis on public property.'" See App. to Pet. for Cert. A15–A16.