124 F.3d 1349
 97 CJ C.A.R. 1839
 Tom SNYDER, Plaintiff-Appellant,
v.
MURRAY CITY CORPORATION, a municipal corporation; H. Craig
Hall, City Attorney for Murray City Corporation,
Defendants-Appellees.
United States of America, Intervenor.
 No. 96-4087.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 10, 1997.
 
 Brian M. Barnard (Andrea Garland and the Utah Legal Clinic, with him on the briefs), Cooperating Attorneys for Utah Civil Rights & Liberties Foundation, Inc., Salt Lake City, UT, for Plaintiff-Appellant.
 Allan L. Larson (Richard A. Van Wagoner, with him on the brief), Snow, Christensen & Martineau, Salt Lake City, UT, for Defendants-Appellees.
 Before KELLY, HOLLOWAY, and BRISCOE, Circuit Judges.
 PAUL KELLY, Circuit Judge.
 
 
 1
 Plaintiff Tom Snyder appeals from the district court's grant of summary judgment in favor of Defendants Murray City and H. Craig Hall, the City Attorney of Murray City. In his 42 U.S.C. § 1983 action, Mr. Snyder alleged that Murray City's refusal to permit him to speak during the reverence portion of a Murray City Council meeting violated his rights under the United States Constitution. He also alleged violations of the Religious Freedom Restoration Act and the Utah Constitution. The talk Mr. Snyder desired to present--which he characterizes as a prayer and the City characterizes as a diatribe against City officials[1]--requests the "Mother in Heaven" to cause the cessation of prayers at public meetings. We exercise jurisdiction under 28 U.S.C. § 1291, and affirm in part and reverse in part.
 
 Background
 
 2
 Since 1982, Murray City has opened its city council meetings with a reverence period, during which an invocation or devotional is presented. The reverence portion of the meetings is designed to encourage lofty thoughts, promote civility, and cause the participants to set aside other matters in order to focus on the topics to be addressed at the meeting. The city council extends invitations to speak during the reverence period to individuals representing a broad cross-section of religious faiths, and invocations or devotionals have been presented at the Murray City Council meetings by Christians, Navajos, Quakers, and Zen Buddhists. One speaker simply requested a moment of silence. Mr. Snyder, who does not reside in Murray City, wrote to the City, advising of his interest in presenting a prayer at a council meeting. Mr. Snyder attached his two-page proposed "Opening Prayer" to the letter.[2] Mr. Snyder's request was part of his personal campaign to stop prayers at public meetings, waged in response to a recent decision of the Supreme Court of Utah which upheld Salt Lake City's practice of opening public meetings with a prayer.
 
 
 3
 Although Mr. Snyder was reared as a member of the Church of Jesus Christ of Latter-Day Saints, he is no longer a practicing member of that faith, or any other organized religion. He testified that he considers himself deeply religious, but is not yet sure what his beliefs are, and leans towards agnosticism. Mr. Snyder cites the Book of Mormon and the Gospel of St. Matthew as the religious bases for his prayer. He believes that prayer should be a private matter between an individual and his or her God, and that Jesus Christ opposed public prayers, including those before government meetings. Although Mr. Snyder testified at his deposition that he believes in God, he also testified that he questions God's existence.
 
 
 4
 On behalf of Murray City, Mr. Hall responded to Mr. Snyder's request and informed him that his proposed prayer was unacceptable because it did not follow the guidelines for prayers which the City had previously provided to Mr. Snyder. Although the council had no formal, written policy, Mr. Snyder had been informed by letter prior to the submission of his proposed prayer that "the purpose of the 'prayer' is to allow individuals [the] opportunity to express thoughts, leave blessings, etc. It is not a time to express political views, attack city policies or practices or mock city practices or policies." Mr. Snyder had also been advised that comments on City practices and policies could be made during city council meetings either by requesting a place on the meeting agenda or by speaking during the citizen comment portion of the meeting. The citizen comment portion of the meeting immediately follows the reverence portion.
 
 
 5
 Mr. Snyder filed this § 1983 action upon receiving in the mail Murray City's denial of his request to give a prayer. He alleges that the City's refusal of his request violated his rights under the United States and Utah Constitutions to free exercise of his religion and to due process. Mr. Snyder also alleges violations of the Establishment Clause of both Constitutions, and the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb-2000bb-4. Both Defendants and Mr. Snyder moved for summary judgment, which the district court granted in favor of the Defendants and denied to Mr. Snyder, who brings this appeal.
 
 Discussion
 
 6
 Our review of questions of constitutional law and dispositions on summary judgment is de novo. United States v. One Parcel Property, 106 F.3d 336, 338 (10th Cir.1997).
 
 
 7
 I. Claims Under the United States Constitution
 
 
 8
 Mr. Snyder brings this action under 42 U.S.C. § 1983. To prevail in a § 1983 claim, a plaintiff must establish that the defendants, while acting under color of state law, deprived him of a right, privilege, or immunity secured by the United States Constitution. We therefore consider whether Murray City's denial of Mr. Snyder's request to deliver his proposed prayer during the reverence portion of a city council meeting violated his rights under the Free Exercise, Establishment, or Due Process Clauses of the Federal Constitution.
 
 
 9
 In his briefs, Mr. Snyder relies upon case law interpreting the Free Speech Clause of the First Amendment. Since he did not allege a violation of his right to free speech, however, we need not consider the arguments raised under that body of law.
 
 A. Free Exercise Claim
 
 10
 The first questions in any free exercise claim are whether the plaintiff's beliefs are religious in nature, and whether those religious beliefs are sincerely held. United States v. Seeger, 380 U.S. 163, 185, 85 S.Ct. 850, 863-64, 13 L.Ed.2d 733 (1965). Only beliefs which are religious in nature are protected by the Free Exercise Clause. Nevertheless, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." Thomas v. Review Bd. of the Ind. Employment Sec. Div., 450 U.S. 707, 714, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981).
 
 
 11
 Although Mr. Snyder swore out affidavits attesting to his sincerity, the district court held that he was not sincere in the beliefs espoused in his proposed prayer. The district court reached this conclusion based upon the text of Mr. Snyder's prayer, which the court found to contain political instead of religious content, and on Mr. Snyder's deposition testimony that he was unsure of his religious beliefs. The inquiry into the sincerity of a free-exercise plaintiff's religious beliefs is almost exclusively a credibility assessment, see Seeger, 380 U.S. at 186, 85 S.Ct. at 864; Mosier v. Maynard, 937 F.2d 1521, 1526 (10th Cir.1991), and therefore the issue of sincerity can rarely be determined on summary judgment. This may well be, however, one of those very rare cases in which the plaintiff's beliefs are "so bizarre, so clearly nonreligious in motivation" that they are not entitled to First Amendment protection. Thomas, 450 U.S. at 715, 101 S.Ct. at 1431.
 
 
 12
 Regardless, we need not decide whether Mr. Snyder's beliefs are religious in nature nor whether they are sincerely held. Nor need we address Mr. Snyder's argument that summary judgment was inappropriate. Even assuming that Mr. Snyder is possessed of sincerely held religious beliefs, as articulated in his proposed prayer, we find that Mr. Snyder's claim is not cognizable under the Free Exercise Clause. In fact, Mr. Snyder's arguments evince a fundamental misconception about the rights bestowed by the Clause.
 
 
 13
 The Free Exercise Clause is one of the Bill of Rights's "thou shall not" prohibitions against certain government actions. The Clause "is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government." Sherbert v. Verner, 374 U.S. 398, 412, 83 S.Ct. 1790, 1798, 10 L.Ed.2d 965 (1963) (Douglas, J., concurring). To protect "the right to believe and profess whatever religious doctrine one desires," Employment Div. v. Smith, 494 U.S. 872, 877, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 (1990), the Free Exercise Clause prohibits the government from impermissibly burdening an individual's free exercise of religion. However, "[t]he Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." Bowen v. Roy, 476 U.S. 693, 699, 106 S.Ct. 2147, 2152, 90 L.Ed.2d 735 (1986).
 
 
 14
 The Free Exercise Clause does not guarantee any person the right to pray whenever and wherever he chooses. Nor does the Clause guarantee a person the right to speak during portions of public meetings set aside for devotional or invocational purposes. Suggestion to the contrary is inconsistent with both common sense and constitutional doctrine. Cf. Heffron v. International Soc'y for Krishna Consciousness, 452 U.S. 640, 647, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981) ("[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired."). We find no violation of the Free Exercise Clause.
 
 B. Establishment Clause Claim
 
 15
 Mr. Snyder claims that Murray City's denial of his request to speak at the reverence portion of its city council meeting violated the Establishment Clause. This argument also misapprehends the protections afforded by that Clause. The Establishment Clause assures that the government will not favor a particular religion, nor religion over nonreligion. Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet, 512 U.S. 687, 703, 114 S.Ct. 2481, 2491, 129 L.Ed.2d 546 (1994). Like the Free Exercise Clause, the Establishment Clause is a prohibition against certain government actions. The Establishment Clause does not give any individual the right to establish his religion by guaranteeing an opportunity to pray during public meetings, and certainly does not require Murray City to permit all comers to speak during the reverence portion of its city council meetings.
 
 
 16
 In Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), the Supreme Court upheld the constitutionality of opening governmental meetings with prayers. The Court observed that the "opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country." Id. at 786, 103 S.Ct. at 3333. "To invoke Divine guidance on a public body entrusted with making the laws is not ... an 'establishment' of religion or a step toward establishment...." Id. at 792, 103 S.Ct. at 3336.
 
 
 17
 Mr. Snyder does not argue that Murray City's practice of opening its city council meetings with prayer violates the Establishment Clause. Marsh appears to foreclose such an argument. Instead, Mr. Snyder argues that Murray City violated the Establishment Clause by permitting others to pray, yet denying him the same opportunity. Marsh suggests that a governmental body's practices in selecting persons to deliver prayers at public meetings may violate the Establishment Clause if the selections are the product of impermissible motives. Id. at 793, 103 S.Ct. at 3337. The record in this matter is devoid of evidence suggesting that Murray City had impermissible motives either in extending invitations to speak, or in denying Mr. Snyder's request.[3] Similarly absent is any suggestion that Murray City used the reverence portion of its city council meetings to advance a particular faith or to disparage any faith or belief. See id. at 794-95, 103 S.Ct. at 3337-38. In contrast, Mr. Snyder's prayer itself disparages those who believe in the propriety of public prayer. Clearly, the content of Mr. Snyder's prayer is in conflict with the City's legitimate objectives in presenting such prayers. Marsh controls the issue before us, and we find no violation of the Establishment Clause.
 
 C. Due Process Claim
 
 18
 Because Mr. Snyder's First Amendment claims are without merit, his claim under the Federal Due Process Clause also fails. It is beyond argument that process is due only when the government terminates a protected interest. Board of Regents v. Roth, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Mr. Snyder was not deprived of any protected interest and therefore he had no entitlement to any sort of process.
 
 II. Religious Freedom Restoration Act Claim
 
 19
 Mr. Snyder appeals from the district court's adverse decision on his RFRA claims. Since this case was argued, however, the Supreme Court has held RFRA unconstitutional. City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). We therefore need not consider the merits of Mr. Snyder's RFRA claims.
 
 III. Claims Under the Utah Constitution
 
 20
 Mr. Snyder also alleges that the City's denial of his request violates the Free Exercise, Establishment, and Due Process Clauses of the Utah Constitution. Although the district court did not reach the merits of these state-law claims, it ruled against Mr. Snyder, finding that the provisions of the Utah Constitution were not "self-executing" and therefore did not provide a cause of action.
 
 
 21
 We have held that when federal claims are resolved prior to trial, the district court should usually decline to exercise jurisdiction over pendent state law claims and allow the plaintiff to pursue them in state court. See Ball v. Renner, 54 F.3d 664, 669 (10th Cir.1995). We believe this general practice is particularly appropriate in this case.
 
 
 22
 The Supreme Court of Utah recently rejected a challenge to Salt Lake City's practice of opening its city council meetings with a prayer. Society of Separationists v. Whitehead, 870 P.2d 916 (Utah 1993). While that challenge was brought under the provision of Utah's Constitution which prohibited the expenditure of public monies for religious purposes and not under its Free Exercise or Establishment Clauses, the Supreme Court of Utah stated in Society of Separationists that it would not follow federal constitutional models in interpreting the Religion Clauses of the Utah Constitution. Id. at 930, 931 n. 36. Given that the interpretation of those Clauses appears to be undergoing an evolution, and given the complex issues of state law presented, we decline to exercise supplemental jurisdiction over Mr. Snyder's state-law claims.
 
 
 23
 We therefore reverse as to the state-law claims and remand them to the district court with instructions to dismiss without prejudice.
 
 
 24
 AFFIRMED in part, REVERSED in part, and REMANDED to the district court.
 
 
 25
 BRISCOE, Circuit Judge, concurring and dissenting:
 
 Federal Free Exercise Claim
 
 26
 I concur with the majority's conclusion that Snyder failed to establish a federal free exercise claim. I agree that the Free Exercise Clause did not guarantee Snyder the right to give his prayer as the opening prayer at city council meetings, and that by excluding Snyder's prayer the City did not impermissibly burden Snyder's right to believe and profess his religious doctrines. His claim is not cognizable under the Free Exercise Clause.
 
 
 27
 However, I disagree with any suggestion that Snyder's claim could be rejected at the summary judgment stage on the ground that his beliefs are not religious in nature. In reviewing the grant of summary judgment, we examine the factual record and reasonable inferences drawn from it in the light most favorable to the party opposing summary judgment. Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir.1996). The record contains evidence that the beliefs expressed in Snyder's prayer have a religious basis, and whether religious beliefs are sincerely held is a question of fact. Mosier v. Maynard, 937 F.2d 1521, 1523 (10th Cir.1991). See United States v. Seeger, 380 U.S. 163, 176, 85 S.Ct. 850, 859, 13 L.Ed.2d 733 (1965). The record does not support a conclusion that the beliefs expressed by Snyder are so bizarre or so clearly nonreligious in nature that the district court could properly resolve the issue on summary judgment.
 
 Religious Freedom Restoration Act Claim
 
 28
 I concur with the majority's conclusion that after City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), we need not consider the merits of Snyder's Religious Freedom Restoration Act claim. The Court held in Boerne that RFRA's restrictions on state and local government actions affecting religion are unconstitutional.
 
 Claims under Utah Constitution
 
 29
 I also concur with the majority's conclusion that it was an abuse of discretion for the district court to exercise supplemental jurisdiction to decide the delicate state constitutional issues. We cannot predict from Society of Separationists, Inc. v. Whitehead, 870 P.2d 916 (Utah 1993), how the Utah Supreme court would decide the state constitutional issues in this case.
 
 Federal Establishment Clause Claim
 
 30
 I respectfully dissent from the majority's conclusion that Snyder's federal Establishment Clause claim is precluded by Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). There are significant differences between this case and Marsh. The sole issue in Marsh was whether the Nebraska Legislature's practice of opening each day's session with a prayer by a chaplain paid by the state violated the Establishment Clause. Using a purely historical analysis, the Court concluded the practice did not establish religion in violation of the First Amendment. The Court reasoned the practice did not establish religion within the meaning of the First Amendment because the First Congress that drafted the Bill of Rights hired chaplains to give prayers at sessions of Congress. The practice of opening legislative sessions with prayer by a chaplain paid by the government is not an establishment of religion within the meaning of the First Amendment, but "is simply a tolerable acknowledgment of beliefs widely held among the people of this country." 463 U.S. at 792, 103 S.Ct. at 3336.
 
 
 31
 Here, the City did not hire or appoint a chaplain as its official religious spokesperson, which was the sole practice at issue in Marsh. Instead, the City sponsored a forum for private individuals to engage in prayer at city council meetings and excluded Snyder from that forum because of the content of his prayer. Snyder does not challenge the City's practice of sponsoring prayer at its council meetings. He challenges only his exclusion from the City-sponsored forum for prayer based on the unacceptable content of his proposed prayer.
 
 
 32
 Marsh is distinguishable from this case for three reasons. First, the historical record does not support censorship of prayer by private individuals at the start of government meetings. Second, prayer by private individuals at the start of meetings of governmental bodies is fundamentally different from prayer by a chaplain who is appointed as the official paid religious spokesperson for the governmental body. Third, the record contains circumstantial evidence that the City had impermissible motives for excluding Snyder's prayer.
 
 
 33
 Although from Marsh we know the members of the First Congress who drafted the First Amendment believed appointment of chaplains did not violate the Establishment Clause, we simply do not know what they would have thought about censorship of prayer at a government-sponsored forum for prayer by individuals at the start of meetings of a legislative body. The censorship of chaplains' prayers at government meetings does not find support in the actions of the First Congress. Research reveals no historical record of the prayers offered by the chaplains of the First Congress. The record of debates and proceedings in the first eighteen congresses in the Annals of Congress do not include chaplains' prayers[1] and, other than the decision of the First Congress to appoint two chaplains of different denominations, one by each house to interchange weekly, see 1 Annals of Congress 968, 1077, 1773, there appears to be no record of the measures, if any, taken by Congress to control the content of such prayers.
 
 
 34
 Marsh suggests that chaplains' prayers could be censored without violating the Constitution. The Court suggested that to be lawful, a legislative chaplain's prayer must be nonsectarian and non-proselytizing:
 
 
 35
 The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.
 
 
 36
 463 U.S. at 794-95, 103 S.Ct. at 3337-38.
 
 
 37
 Conversely, the content of sectarian, proselytizing prayer by a legislative chaplain would be of concern to the courts as a possible establishment of religion. See County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 603, 109 S.Ct. 3086, 3106, 106 L.Ed.2d 472 (1989). Such prayer by a legislative body's official religious spokesperson could reasonably be viewed as governmental endorsement of a particular religion in violation of the Establishment Clause. Consequently, it may not violate the Establishment Clause for a government official to determine whether a chaplain's prayers are sufficiently nonsectarian and nonproselytizing in order to avoid violating the Establishment Clause. Censorship or control of the content of a legislative chaplain's prayers could be justified only by the need to avoid violating the Establishment Clause by keeping the prayers within the limits allowed by Marsh.
 
 
 38
 It is true Snyder's proposed prayer was proselytizing in nature because it was intended to convert listeners to his point of view on the impropriety of prayer at a governmental function. It is also true that although Snyder was not a member of any organized religious sect, his prayer was sectarian in the sense that it represented his particular beliefs and did not attempt to encompass shared beliefs. However, Snyder is not a chaplain hired or appointed to be the City's official religious spokesperson. The prayers at the start of the city council meetings are not offered by a chaplain, but by members of the public representing a broad range of religious beliefs. The Establishment Clause's guarantee of government neutrality toward religion is not offended, but respected, when the government, following neutral criteria and evenhanded policies, gives access to a forum to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse. See Rosenberger v. Rector and Visitors of the University of Virginia, 515 U.S. 819, 837-39, 115 S.Ct. 2510, 2521, 132 L.Ed.2d 700 (1995). See also Board of Education v. Mergens, 496 U.S. 226, 248-49, 110 S.Ct. 2356, 2370-71, 110 L.Ed.2d 191 (1990); Widmar v. Vincent, 454 U.S. 263, 277, 102 S.Ct. 269, 278, 70 L.Ed.2d 440 (1981). If the City permitted Snyder to offer his prayer, a reasonable observer aware of the City's practice of inviting persons representing a broad range of religious and nonreligious viewpoints to give invocations would not regard Snyder's prayer as representing the City's endorsement of his particular beliefs. Consequently, permitting the prayer would not have violated the Establishment Clause. See Rosenberger, 515 U.S. at 842-43, 115 S.Ct. at 2523; Capitol Square Review and Advisory Board v. Pinette, 515 U.S. 753, 768-70, 115 S.Ct. 2440, 2450, 132 L.Ed.2d 650 (1995); Mergens, 496 U.S. at 250-51, 110 S.Ct. at 2372; see also Capitol Square, 515 U.S. at 779-81, 115 S.Ct. at 2455 (O'Connor, J., concurring); County of Allegheny, 492 U.S. at 636, 109 S.Ct. at 3123-24 (O'Connor, J., concurring). Because permitting Snyder's prayer would not have violated the Establishment Clause, justification for permitting governmental censorship or control of the content of chaplain's prayers suggested by Marsh is not present here.
 
 
 39
 Marsh also suggests that a governmental body's selection of persons to deliver prayers at its meetings may violate the Establishment Clause if the selections are the product of impermissible motives. I disagree with the majority's conclusion that the record is devoid of evidence suggesting the City had impermissible motives in denying Snyder's request to offer his prayer. I do not, as footnote 3 of the majority opinion asserts, concede there is no actual evidence of impermissible motive. There is no direct evidence, but there is circumstantial evidence of impermissible motive. Direct evidence of discriminatory intent is rarely available, and it is not a novel proposition to say that intent may be proved by circumstantial evidence. See, e.g., Denison v. Swaco Geolograph Co., 941 F.2d 1416, 1420 (10th Cir.1991). Viewed in the light most favorable to Snyder, the record supports an inference that the guidelines were drafted specifically to exclude Snyder's prayer because its content was offensive.
 
 
 40
 Snyder wrote to the City in March 1994, expressing interest in presenting a prayer at a council meeting and asking if there were any guidelines or restrictions on such prayers. Snyder received no reply and wrote again in May, again expressing interest in presenting a prayer and inquiring about any guidelines or restrictions. His request was forwarded to H. Craig Hall, City Attorney of Murray City, who answered Snyder's letter on June 1, 1994.
 
 
 41
 The City had no formal, written guidelines or restrictions on prayers before council meetings until Snyder asked if there were any. Persons asked to give invocations were simply asked to give an "invocation, appropriate message, or inspirational thought." (Appellant's append. at 281.) According to Hall, since the prayers began in 1982, a custom and practice of "positive, upbeat" prayers "exhorting the City Council to do what they ought to do under their statutory responsibilities" had developed. No one had ever attacked City policies or the council during an invocation.
 
 
 42
 By the time Snyder made his request, the City Council of Salt Lake City had decided not to have prayer at the opening of council meetings rather than deal with a request by Snyder that he be permitted to deliver a prayer virtually identical to the prayer at issue in this case. Snyder's prayer was likely to offend a great many people of a variety of Christian faiths on religious grounds. The prayer questions the divinity of Jesus and the existence of heaven, and expresses a belief that God may take the form of a woman. These views are controversial, to say the least. Snyder's proposed prayer and the decision of the Salt Lake City Council were reported in the newspapers. Hall had read newspaper articles about Snyder's request to present the prayer at a Salt Lake City Council meeting, and this knowledge influenced his response to Snyder's request. The record establishes that Hall believed (correctly, as it turned out) Snyder would propose a similar or identical prayer to Murray City, and he drafted his response to exclude the expected prayer. This response constituted the City's first written or unwritten guidelines for prayer at council meetings. In his letter to Snyder, Hall stated that acceptable invocations, inspirational messages, or prayers must not "express political views, attack City policies or practices or mock City practices or policies." (Appellant's append. at 10.) In his deposition, however, he said that not all political views are prohibited; apparently only views critical of the council or its policies and practices.
 
 
 43
 Upon receiving Hall's response, Snyder sent a copy of his prayer and a request that he be permitted to offer it at a council meeting. On June 30, Hall responded with a letter stating the text of the proposed prayer was "unacceptable" under the guidelines set out in his letter of June 1. (Appellant's append. at 14.) The next month, the City invited the pastor of a local church to deliver an invocation and the invitation made no mention of any guidelines or restrictions.
 
 
 44
 The record would support inferences that the City had no restrictions on the content of prayers until Snyder made his request, that the restrictions were drafted specifically to exclude Snyder's prayer, and that the restrictions were not applied to others. Although there was evidence the City had the permissible motive of promoting civility, and although there was no direct evidence of impermissible motives, the circumstantial evidence is sufficient to support an inference that the City acted to exclude Snyder's prayer because it found the content offensive. Because the record contains evidence the City acted with impermissible motives, Marsh cannot justify entry of summary judgment for the City.
 
 
 45
 Because Marsh is not controlling, determining whether the City's exclusion of Snyder based on the content of his prayer violates the Establishment Clause requires further analysis. The long-standing test for determining whether government action violates the Establishment Clause first set out in Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), has been modified in recent cases. Under the Lemon test, government action regarding religion violates the Establishment Clause unless it meets three conditions: (1) It must have a secular purpose; (2) its principal or primary effect must be one that neither advances nor inhibits religion; and (3) it must not foster excessive government entanglement with religion. The Court has in some cases recast the first and second parts of the Lemon test to ask whether the challenged government action was intended to endorse or disapprove, or has the effect of endorsing or disapproving, religion. See County of Allegheny, 492 U.S. at 592-93, 109 S.Ct. at 3100-01; Lynch v. Donnelly, 465 U.S. 668, 687-94, 104 S.Ct. 1355, 1366-70, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring); Robinson v. City of Edmond, 68 F.3d 1226, 1229 (10th Cir.1995), cert. denied 517 U.S. 1201, 116 S.Ct. 1702, 134 L.Ed.2d 801 (1996). In Agostini v. Felton, 521 U.S. 203, ---- - ----, 117 S.Ct. 1997, 2014-16, 138 L.Ed.2d 391 (1997), the Court explained that entanglement is properly understood as an aspect of an inquiry into the effect of the government action rather than as a separate factor in the test.
 
 
 46
 The stated purpose for the City's exclusion of Snyder's prayer was secular--to promote civility at city council meetings. However, as discussed above, the record supports an inference that the City drafted its prayer guidelines and applied them only to Snyder because it found the content of his prayer offensive. On this record, whether the stated purpose was a pretext for impermissible motives is a question of fact. The exclusion of Snyder's prayer also had the effect of expressing disapproval of his religious views. A reasonable observer familiar with the City's practices could conclude from exclusion of the prayer that the City disapproved of Snyder's beliefs. See Chandler v. James, 958 F.Supp. 1550, 1566 (M.D.Ala.1997).
 
 
 47
 The City's censorship of the content of the prayer also constitutes excessive entanglement. Governmental monitoring and control of the content of prayer inevitably establishes religion by entangling the government in religious issues. "[R]eview of prayers by government officials is one of the very practices which the First Amendment was designed to prevent. The framers knew that government involvement with one's religious practices would inevitably taint the sanctity of one's faith." Chandler, 958 F.Supp. at 1566 (holding statute permitting student-led, nonsectarian, nonproselytizing prayer in public schools unconstitutional). See also Ingebretsen v. Jackson Public School District, 88 F.3d 274, 279 (5th Cir.), cert. denied --- U.S. ----, 117 S.Ct. 388, 136 L.Ed.2d 304 (1996). In Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), the Court held prayer at a high school graduation by a clergyman invited by the principal violated the Establishment Clause. The Court did not apply the Lemon or endorsement tests, but focused on the susceptibility of high school students to coercion. However, the Court in effect found excessive entanglement in concluding the principal's control over the content of the prayer offended the Establishment Clause. The Court concluded: "It is a cornerstone principle of our Establishment Clause jurisprudence that 'it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by the government,' and that is what the school officials attempted to do." 505 U.S. at 588, 112 S.Ct. at 2656 (quoting Engel v. Vitale, 370 U.S. 421, 425, 82 S.Ct. 1261, 1264, 8 L.Ed.2d 601 (1962)).
 
 
 48
 Similarly, in Sands v. Morongo Unified School Dist., 53 Cal.3d 863, 281 Cal.Rptr. 34, 809 P.2d 809 (1991), cert. denied 505 U.S. 1218, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992), the court held a school district's attempt to control the content of high school graduation prayers constituted excessive entanglement. "To allow preventive monitoring by the state of the content of religious speech inevitably leads to gradual official development of what is acceptable public prayer. 'This result is as contrary to the requirements of the Establishment Clause as is ... composition of an official state prayer.' " 281 Cal.Rptr. at 43, 809 P.2d at 818 (quoting Weisman v. Lee, 728 F.Supp. 68, 74 (D.R.I.1990), aff'd 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)).
 
 
 49
 Courts that have rejected Establishment Clause challenges to state and local legislative prayer have also recognized the risk of excessive entanglement even as they upheld the practice in general. In Bogen v. Doty, 598 F.2d 1110 (8th Cir.1979), the court rejected an Establishment Clause challenge to a county board's practice of opening meetings with prayer by an unpaid local clergyman. However, the court stated:
 
 
 50
 We would be less than candid if we did not warn the county of the quagmire it is near. Up to the time of oral argument, all persons delivering invocations were members of the Christian faith. We have no reason to believe that persons of any religious persuasions have volunteered and been turned down by the board. If in the future this should occur the board will be in a very difficult position to defend against an allegation that it is excessively entangled in religion by giving public approval to some groups while denying it to others.
 
 
 51
 598 F.2d at 1114. In upholding a statute authorizing the use of public funds to pay salaries of chaplains for the state legislature, the Massachusetts Supreme Court noted:
 
 
 52
 There is no evidence that a great degree of government entanglement with religion is occasioned by the employment of legislative chaplains. The prayers offered are brief, the content unsupervised by the State, and attendance completely voluntary. There is no evidence that the State has become embroiled in any difficult decisions about which religions are to be represented or what sorts of invocations are to be offered.
 
 
 53
 Colo v. Treasurer and Receiver General, 378 Mass. 550, 392 N.E.2d 1195, 1200 (1979) (emphasis added). See Lincoln v. Page, 109 N.H. 30, 241 A.2d 799, 800 (1968); Marsa v. Wernik, 86 N.J. 232, 430 A.2d 888, 901 (1981) (Pashman, J., concurring).
 
 
 54
 Not all government oversight of religious activities violates the Establishment clause--the entanglement must be excessive. Although mere custodial oversight of religious activities at a government-sponsored forum does not constitute excessive entanglement, see Mergens, 496 U.S. at 253, 110 S.Ct. at 2373, the censorship of prayer goes far beyond mere custodial oversight, and strikes at the heart of the Establishment Clause. Moreover, if the City applied its guidelines to all prayers at council meetings, the censorship would be regular and frequent. In Lemon, 403 U.S. at 620, 91 S.Ct. at 2114-15, the Court held state aid to parochial schools violated the Establishment Clause because of the monitoring required to ensure that teachers paid with public funds did not teach religion. "A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected.... These prophylactic contacts will involve excessive and enduring entanglement between state and church." Here, if Murray City were to consistently apply its prayer guidelines and review all prayers before its meetings, the city attorney would have to censor prayers approximately thirty-six times a year.
 
 
 55
 I recognize that the invocation ceremony at the start of city council meetings is not a public forum open for indiscriminate public speech by the general public. It is a limited forum from which the government may exclude a speaker who wishes to address a topic not encompassed within the purpose of the forum, although it cannot exclude a speaker solely to suppress a point of view espoused on an otherwise includible subject. Cornelius v. NAACP Legal Defense and Educational Fund, Inc., 473 U.S. 788, 806, 105 S.Ct. 3439, 3451, 87 L.Ed.2d 567 (1985). See Rosenberger, 515 U.S. at 827-31, 115 S.Ct. at 2516-17; Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384, 392-94, 113 S.Ct. 2141, 2147-48, 124 L.Ed.2d 352 (1993). The City limited the forum to speech appropriate for an invocation ceremony. The stated purpose of the invocation ceremony was to promote civility, solemnize the occasion, and encourage concentration on the matters on the agenda by appropriate inspirational messages, including prayers. When confronted with a prayer it deemed inappropriate for the invocation, the City drew up guidelines prohibiting prayer expressing political views or attacking or mocking City policies and practices. Such prayer would not tend to promote civility or solemnize the occasion.
 
 
 56
 The City could not properly exclude prayer attacking or mocking the city council or its policies and practices unless it also excluded prayer defending or supporting the council and its policies and practices. Otherwise, it would be allowing prayer on political matters, but from only one point of view. The guidelines purported to exclude all prayer expressing political views, but the record indicates some political views were permitted, and the record would support an inference that the City drafted its guidelines specifically to exclude Snyder's religious views.
 
 
 57
 Moreover, even neutral exclusion of all prayer expressing political views would violate the Establishment Clause. The City specifically invited religious speech in the form of prayer. Neutral enforcement of the rule prohibiting prayer expressing political views would entangle the City in religion by requiring censorship of prayer. It could also convey a message of governmental disapproval of religions whose adherents feel compelled to address political issues.
 
 Procedural Due Process Claim
 
 58
 Because in my view, the district court erred in entering summary judgment against Snyder's federal Establishment Clause claim, I also dissent from the majority's conclusion that because Snyder was not deprived of any protected interest, his due process claim fails.
 
 
 
 [1]
 We recognize that the parties disagree over whether Mr. Snyder's proposed speech was a prayer and whether Murray City denied his request. The City's letter to Mr. Snyder informed him that, until his "proposed prayer satisfies [the City's] guidelines, an invitation to participate in our opening ceremonies will not be forthcoming." The City also advised Mr. Snyder that he could request a place on the meeting agenda or voice his thoughts during the citizen comment portion of the meeting. For ease of reference, however, we adopt the terminology used by the parties and refer to Mr. Snyder's talk as a prayer and the City's action as a denial of his request to deliver his prayer
 
 
 [2]
 Mr. Snyder's proposed prayer read as follows:
 OUR MOTHER, who art in heaven (if, indeed there is a heaven and if there is a God that takes a woman's form) hallowed be thy name, we ask for thy blessing for and guidance of those that will participate in this meeting and for those mortals that govern the state of Utah;
 We fervently ask that you guide the leaders of this city, Salt Lake County and the State of Utah so that they may see the wisdom of separating church and state and so that they will never again perform demeaning religious ceremonies as part of official government functions;
 We pray that you prevent self-righteous politicians from mis-using the name of God in conducting government meetings; and, that you lead them away from the hypocritical and blasphemous deception of the public, attempting to make the people believe that bureaucrats' decisions and actions have thy stamp of approval if prayers are offered at the beginning of government meetings;
 We ask that you grant Utah's leaders and politicians enough courage and discernment to understand that religion is a private matter between every individual and his or her deity; we beseech thee to educate government leaders that religious beliefs should not be broadcast and revealed for the purpose of impressing others; we pray that you strike down those that mis-use your name and those that cheapen the institution of prayer by using it for their own selfish political gains;
 We ask that the people of the State of Utah will some day learn the wisdom of the separation of church and state; we ask that you will teach the people of Utah that government should not participate in religion; we pray that you smite those government officials that would attempt to censor or control prayers made by anyone to you or to any other of our Gods;
 We ask that you deliver us from the evil of forced religious worship now sought to be imposed upon the people of the State of Utah by the actions of mis-guided, weak and stupid politicians, who abuse power in their own self-righteousness;
 All of this we ask in thy name and in the name of thy son (if in fact you had a son that visited earth) for the eternal betterment of all of us who populate the Great State of Utah.
 Amen.
 
 
 [3]
 Conceding that no actual evidence of improper motive exists, the dissent attempts to create a material issue of fact sufficient to justify a trial by citing a collection of supposed inferences. Dissent at 1358. A mere demonstration that the City denied Mr. Snyder's request because of the content of his prayer does not prove a violation of the Establishment Clause. To survive the motion for summary judgment, Mr. Snyder was required to produce evidence from which reasonable jurors could find by a preponderance of the evidence that the City had an impermissible motive, Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); in other words, that the City denied Mr. Snyder's request because it preferred another religion, or nonreligion, over his religion. Genuine issues of material facts may be founded upon inferences; however, those inferences must be reasonable inferences, and must amount to more than a scintilla of evidence. Id.; see also Black v. Baker Oil Tools, 107 F.3d 1457, 1460 (10th Cir.1997). Even assuming that a collection of inferences can create a genuine issue of material fact, this record cannot reasonably be considered to have created such an issue
 
 
 [1]
 Nor does the Congressional Globe, which covers the mid-19th century. The opening prayers of congressional chaplains were not recorded in the Congressional Record from its start in 1873 until the early twentieth century